**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

|  |  |
|---|---|
| SAMSUNG ELECTRONICS CO., LTD. & SAMSUNG ELECTRONICS AMERICA, INC., <br><br> Plaintiffs, <br><br> v. <br><br> DATANG MOBILE COMMUNICATIONS EQUIPMENT CO., LTD., <br><br> Defendant. | Civil Action No. _____ <br><br><br> **DEMAND FOR JURY TRIAL** <br><br> **REDACTED PUBLIC VERSION** |

**PLAINTIFFS' COMPLAINT FOR DECLARATORY JUDGMENT**
**OF PATENT INVALIDITY; BREACH OF CONTRACT; AND**
**BREACH OF OBLIGATION TO NEGOTIATE IN GOOD FAITH**

**INTRODUCTION**

1.    Plaintiffs Samsung Electronics Co., Ltd. ("SEC") and Samsung Electronics America, Inc. ("SEA") (collectively, "Samsung") bring these claims for the Court to determine that certain U.S. patents owned by Defendant Datang Mobile Communications Equipment Co., Ltd. ("Datang") are invalid, as well as to declare that Datang's ███████████████████ ████████████████████—namely patents that Datang declared "essential" to the 4G and 5G standards adopted by the cellular technology industry—breached Datang's commitment to license such patents on terms and conditions that are "fair, reasonable, and non-discriminatory" or "FRAND" and its obligation to negotiate with Samsung in good faith.

2.    The patents at issue in this Complaint are, on information and belief, representative of the strength—or lack of strength—of Datang's portfolio of U.S. 4G- and 5G-related patents.  They show that Datang's portfolio contains a significant number of invalid

patents and a pattern by Datang in obtaining patents on other companies' technology or obvious variations thereof. Datang, nevertheless, ███████████████████████████ on U.S. patents that it knows or should have known are invalid in violation of the FRAND licensing commitments it is bound by with ETSI.[1] Further compounding Datang's breach of its FRAND commitment, Datang ████████, on information and belief, ███████████████████████ ███ what Apple paid for Apple's far greater use of the same patents. In this manner, on information and belief, ██████████████████████████ similar terms and conditions to those provided to Apple for its use of Datang's 4G- and 5G-related patents, and ████████ ████████████████████████████████████ not compliant with FRAND, including the "non-discrimination" obligation. Moreover, despite providing a license to Apple in December 2021 █████████████████████████ and the Apple agreement being, on information and belief, a comparable license under applicable law, ████████ ███████████████████████████████████████████████ ██████████████████████████ the terms and conditions provided to Apple for a license covering its U.S. 4G- and 5G-related patents.

3.      Further still, Datang ████████ the threat of injunctions in China ██████████████ ████████████████████████████████████ for access to Datang's U.S. patent rights. For example, in December 2022, Datang filed suit in China seeking injunctions on Chinese patents declared essential to cellular standards. Moreover, in July 2023, ████████████ ████████████████████████████████████████████████████████████████████

---

[1] Short for the European Telecommunications Standards Institute, ETSI produces global standards for Information and Communications Technologies (ICT), including fixed, mobile, radio, converged, broadcast, and Internet technologies. ETSI is a not-for-profit organization with more than 900 member organizations drawn from over 60 countries and five continents.



This ██████████████████████████████████████████████████████████████

████████████████████████████████ violates the FRAND commitment attached to Datang's patents declared essential to the 4G and/or 5G standards, including the U.S. patents at issue in this action.  And to date, ████████████████████████████████████ based on Samsung's understanding and belief as to the Apple license.

4.      Patents represent national rights.  The parties' disagreement over the validity of Datang's U.S. patents and Datang's ███████████████ its 4G- and 5G-related U.S. patents in a manner that breaches Datang's FRAND commitment gives rise to claims that only U.S. courts have the power to resolve.  Datang has availed itself of the laws the United States in seeking U.S. patents, and now ██████████ against Samsung in a manner that violates Datang's FRAND commitment involving those patents.  Datang does so despite the challenged patents not satisfying the requirements of Title 35 of the United States Code and being directed to technology that Datang did not develop and does not own.  On information and belief, Datang has licensed its 4G- and 5G-related U.S. patents to Apple, including the patents challenged in this action, █████████████████████████████████████████████ in violation of the non-discrimination requirement of FRAND.  Samsung, thus, brings this action in this Court pursuant to 35 U.S.C. § 293 to vindicate important U.S. rights involving U.S. patents.

---

[2]  Samsung has in good faith limited the redactions in the Public Complaint to the minimum possible given the applicable confidentiality obligations and restrictions that necessitate the redactions.  In addition to redactions based a non-disclosure agreement (Ex. A), references to proceedings in ████████ are redacted in view of confidentiality-related rules or restrictions that Samsung's counsel understands to be applicable to those proceedings.

## THE PARTIES

5.      Plaintiff SEC is a corporation organized and existing under the laws of the Republic of Korea, with its principal place of business at 129 Samsung-ro, Maetan-3dong, Yeongtong-gu Suwon-si, Gyeonggi-do 16677.  Established as a small business in Daegu, South Korea, in 1969, SEC, along with its subsidiaries, has grown to become a household name in the United States and a global leader in various technology areas, ranging from computers to mobile devices, mobile infrastructure equipment, semiconductors, home appliances, televisions, and numerous other business areas.  Through its innovation, hard work, and investment, SEC is one of the most successful manufacturers and providers of cellular communication devices in the world and has long-focused on the United States as a critical market for its products.

6.      Plaintiff SEA is a New York corporation having its principal place of business at 85 Challenger Road, Ridgefield Park, New Jersey 07660.  SEA is involved in extensive U.S.-based activities relating to the commercialization, importation, sales, marketing, distribution, service, and repair of mobile devices, including smartphones, tablets, and smartwatches, that communicate using cellular standards, including 4G and 5G.  In recent years, SEA has sold millions of mobile devices that communicate using 4G and 5G cellular standards, and SEA continues to offer and sell mobile devices in the United States that communicate using 4G and 5G cellular standards.  SEA is second only to Apple in the U.S. market for smartphone sales, having, in recent years, about half of Apple's unit sales and about one-third the revenue based on industry reports.  Amongst a number of other business activities in the United States, SEA is also involved in the commercialization, importation, sales, marketing, and distribution of mobile infrastructure equipment, home appliances, and televisions.

7.      On information and belief, Defendant Datang Mobile Communications Equipment Co., Ltd. is a state-owned Chinese corporation with its principal place of business at

4

1/F, Building 1, No. 5 Shangdi East Road, Haidian District, Beijing, China 100085.  On information and belief, Datang manufactures mobile infrastructure equipment, was heavily involved in the development of a 3G cellular standard used in China called TD-SCDMA, and has focused its work involving mobile communications standards on TDD (time division duplex) technologies, which are widely implemented in China but have substantially less applicability to cellular networks in the United States, for example.  China is Datang's largest jurisdiction for its 4G- and 5G-related patents by a wide margin.  Outside of China, the United States is the jurisdiction in which Datang has the largest number of 4G- and 5G-related patents, making Datang's U.S. patent rights and ███████████ a license to Samsung on FRAND terms and conditions covering its 4G- and 5G-related U.S. patents a critical and important aspect of the parties' global dispute.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction over the federal claims alleged herein under 28 U.S.C. §§ 1331 and 1338(a).  This Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) over other claims that form part of the same case or controversy as the federal law claims.  This Court may grant declaratory relief in this action pursuant to at least 28 U.S.C. § 2201 *et seq*.  An actual controversy exists under the Declaratory Judgment Act because, as set forth herein, ██████████████████████████████████ ██████████ Samsung's U.S. activities and the U.S. patents that are the subject of this Complaint, and Samsung alleges that the subject patents are invalid for failure to satisfy the requirements of Title 35 of the U.S. Code.

9.      On information and belief, Datang is the owner of the patents-in-suit and has not identified an agent for service of process in the United States in connection with the patents-in-suit pursuant to 35 U.S.C. § 293.

10. Datang is a Chinese corporation and is therefore a "patentee not residing in the United States" pursuant to 35 U.S.C. § 293.

11. Accordingly, 35 U.S.C. § 293 provides this Court with personal jurisdiction over Datang, as this Court "shall have the same jurisdiction to take any action respecting the patent or rights thereunder that it would have if the patentees were personally within the jurisdiction of the court."

12. To the extent Datang is an agency or instrumentality of a foreign state as defined by 28 U.S.C. § 1603, Datang is not immune from the jurisdiction of this Court because Datang has obtained certain United States patents, including the 4G- and 5G-related U.S. patents challenged in this suit, has maintained those patents, has engaged with U.S.-based legal counsel for the prosecution of those patents, and ███████████████████████████████ ██████████████████████████████████████████████████████████████ ██████████████████████████ █████████████████████████████████ ████████████████████ Samsung's United States activities relating to Samsung's 4G- and 5G-compliant mobile devices constitutes commercial activity having a direct effect in the United States. Accordingly, to the extent Datang is an agency or instrumentality of a foreign state, Datang is subject at least to the general exception for "commercial activity" under 28 U.S.C. § 1605(a)(2).

13. Venue is proper in this judicial district under 28 U.S.C. § 1391(b)(3) because Datang is subject to this Court's personal jurisdiction under 35 U.S.C. § 293. Venue is also proper under 28 U.S.C. § 1391(c)(3) because a defendant that does not reside in the United States may be sued in any judicial district.

## FACTUAL BACKGROUND

14. As further explained below, cellular technology, and the companies that

manufacture mobile devices that use that technology, are reliant on standards.  The widespread adoption of uniform standards is critical to the interoperability of phones, tablets, and other mobile devices and has propelled the rapid advancement of these globe-changing products.

15.     In order to practice industry standards, it is often necessary for the market to use patented technology that is "essential" to that particular standard.  To protect companies from the possibility that patent holders will abuse market power, engage in patent hold-up, or demand unreasonable or discriminatory terms and conditions once their technology has been chosen, the markets depend on a licensing paradigm known as FRAND—namely fair, reasonable, and non-discriminatory—that dictates that licenses for patents declared "standard essential" will be available on terms that are fair, reasonable, and non-discriminatory to all who seek to practice the standard.

16.     As its name suggests, FRAND pricing does not allow the patent holder to discriminate in the licensing terms and conditions it provides to similarly-situated companies desiring to practice the standard, but rather requires that similar terms given to one company for that company's use of FRAND-encumbered patents be offered to a competitor accounting for the competitor's use of the same FRAND-encumbered patents.  In doing so, FRAND terms encourage technology development, collaboration, and competition.

17.     This dispute involves the technology standards underlying cellular networks, including fourth generation (4G) and fifth generation (5G) telecommunications standards. Datang, along with its parent and/or affiliated companies or organizations the China Academy of Telecommunication Technology ("CATT") and CICT Mobile Communication Technology Co., Ltd. ("CICT"), is a participant in ETSI.  In connection with its participation with ETSI, Datang, directly and/or by or through CATT and/or CICT, has declared many of its patents as "essential"

to ETSI's telecommunications standards.  Having voluntarily declared certain patents as "essential" to these standards, Datang is now contractually bound to offer a license to them on FRAND terms and conditions, including the requirement that Datang not discriminate against similarly-situated licensees for their respective uses of the FRAND-encumbered patents.

18.     Under Datang's FRAND commitment, Datang cannot, for example, discriminate against one company by providing materially worse or less advantageous terms and conditions to that company for a license for its use of Datang's patents declared to be standard essential, while having offered or provided materially better or more advantageous terms and conditions to a similarly-situated competitor for the competitor's use of Datang's patents declared to be standard essential.  However, as further explained below, ████████████████████████████ ██████, in violation of the FRAND commitment attached to its 4G- and 5G-related U.S. patents.  In the paragraphs that follow, this Factual Background section provides an overview of the standard setting process, Datang's FRAND commitment, the parties' dispute, and ████████ ████████████████████████████████████ Datang's patents that are declared essential to the 4G and 5G standards, including invalid U.S. patents for which Samsung seeks a declaration of invalidity in this action.

## A.     Background on Cellular Standards and Their Intellectual Property Rights Policies

19.     Initially, regional standard setting organizations were formed to create technical specifications that companies could follow to ensure their products would be compatible with other companies' products and systems within a particular region, such as China, but not necessarily across the globe.  Today, global wireless communications standards are the norm. Having access to such standards encourages product designers and manufacturers to invest in the development of handsets or component parts because, so long as their products are compliant with the published technical standard, they will operate effectively within the carrier networks

and be compatible with other products from third parties.

20.     Standards also reduce costs for both suppliers and consumers.  Because a single product or product line may be sold to multiple purchasers and distributed more widely, manufacturing volumes can increase, and unit costs can decrease.  Consumers, in turn, can benefit from increased price competition among suppliers.

21.     On the other hand, technical standardization also creates a "lock-in" effect as particular technologies are chosen for incorporation into a standard with a concomitant risk of patent hold-up.  Although standards are the products of coordination and compromise among competitors, it is recognized that certain aspects of standards may be covered by patents.  Before standardization, the royalty a patentee can earn from a patent license for its technology is constrained in part by the availability of technical alternatives.  Once a patented technology is incorporated into a standard, technological approaches that may have been viable pre-standardization may no longer be available substitutes.  Once a patented technology has been locked into the standard, a risk exists that the patentee could demand royalties in excess of what would otherwise be warranted by the intrinsic value of the technology or demand royalties in a manner that discriminates against one competitor over another in the market for the products using the standard.

22.     Companies that implement a standard thus become "locked-in."  Left unconstrained, owners of patents that purportedly cover certain features within the standard can take advantage of lock-in and demand unfair, unreasonable, and/or discriminatory royalties or other terms from the technology providers, knowing that it would be less costly for the provider to pay the excessive or discriminatory royalty or capitulate to unfair, unreasonable, or discriminatory terms rather than incur the cost and burden of switching.  This dynamic is often

called "patent hold-up."

23.     Accordingly, most standard setting organizations have adopted Intellectual Property Rights ("IPR") policies to govern the use and incorporation of patented technology and address the problem of patent hold-up.  These policies typically require, amongst other things: (a) disclosure in good faith of patents that may claim any portion of the specification of the standard in development; and (b) an irrevocable commitment to license patents that are purportedly essential to implement a standard on FRAND terms and conditions or for free.

24.     In the same spirit, U.S. law and policy supports the challenge of invalid patents, as invalid patents confer undeserved benefits on their owners and stifle innovation.  See *Lear v. Atkins*, 395 U.S. 653, 670 (1969) (identifying "the important public interest in permitting full and free competition in the use of ideas which are in reality a part of the public domain").  This is particularly true in a standard setting context as a requirement to license an invalid patent constrains competition and imposes unnecessary costs.  And, in case of nonresident patent holders, 35 U.S.C. § 293 furthers this important U.S. legal and policy imperative by granting this Court, "the same jurisdiction to take any action respecting the patent or rights thereunder that it would have if the patentee were personally within the jurisdiction of the court."

**B.      Wireless Telecommunications Standards Published by Standards Setting Organizations**

25.     Cellular telecommunications standards have been implemented through several open standards setting organizations ("SSOs").  Today, cellular telecommunications standards are developed largely through the Third Generation Platform Partnership ("3GPP"), which unites seven standard setting organizations from different areas around the world.  Each of these SSOs is known as an organizational partner, and amongst the organization partners is the U.S.-based Alliance for Telecommunications.  Market participants working within 3GPP developed a 3G

standard called Universal Mobile Telecommunications Standard ("UMTS") and a 4G standard called Long Term Evolution ("LTE"), as well as the 5G New Radio ("5G" or "5G/NR") standard.  Dozens of companies participate in 3GPP through ETSI and make technical contributions to the various cellular standards supported by ETSI, including Samsung and Datang.

26.     At 3GPP, representatives from member companies collaborate in so-called working groups.  Working group members make technical proposals that concern different aspects or features of the standard they are trying to develop.  These proposals can reflect or incorporate patented technology.  To address the role of patents, ETSI has adopted detailed policies pertaining to the disclosure of IPRs, including patents, that may claim any portion of the specification of the standard in development and whether and to what extent parties holding purportedly essential IPRs must commit to license them on FRAND terms and conditions.

27.     ETSI has developed "Rules of Procedure" regarding IPRs, entitled the "ETSI Intellectual Property Rights Policy" ("ETSI IPR Policy").  This code of practice requires parties participating in the work of 3GPP to identify potentially essential IPRs on a bona fide basis and state whether they will agree to license them.  Specifically, the owners of such IPRs are requested to provide "an irrevocable undertaking in writing that they are prepared to grant irrevocable licenses on Fair, Reasonable and Non-Discriminatory ('FRAND') terms and conditions."  Although the ETSI IPR Policy has been amended from time to time, there are no material differences between the current version and other versions of the ETSI IPR Policy that may have been in force at relevant times.

28.     Clause 6.1 of ETSI's IPR Policy governs the availability of licenses to essential IPRs:

11

When an ESSENTIAL IPR relating to a particular STANDARD or TECHNICAL SPECIFICATION is brought to the attention of ETSI, the Director-General of ETSI shall immediately request the owner to give within three months an irrevocable undertaking in writing that it is prepared to grant irrevocable licenses on fair, reasonable and non-discriminatory [("FRAND")] terms and conditions under such IPR to at least the following extent:

- MANUFACTURE, including the right to make or have made customized components and sub-systems to the licensee's own design for use in MANUFACTURE;

- sell, lease, or otherwise dispose of EQUIPMENT so MANUFACTURED;

- repair, use, or operate EQUIPMENT; and

- use METHODS.

The above undertaking may be made subject to the condition that those who seek licenses agree to reciprocate.

29.     Clause 15 of the ETSI IPR Policy defines an IPR as "any intellectual property right conferred by statute law including applications therefor other than trademarks.  For the avoidance of doubt rights relating to get-up, confidential information, trade secrets or the like are excluded from the definition of IPR."

30.     Clause 15 the ETSI IPR Policy defines "Essential" as follows:

"ESSENTIAL" as applied to IPR means that it is not possible on technical (but not commercial) grounds, taking into account normal technical practice and the state of the art generally available at the time of standardization, to make, sell, lease, otherwise dispose of, repair, use or operate EQUIPMENT or METHODS which comply with a STANDARD without infringing that IPR. For the avoidance of doubt in exceptional cases where a STANDARD can only be implemented by technical solutions, all of which are infringements of IPRs, all such IPRs shall be considered ESSENTIAL.

31.     Appendix A to the ETSI IPR Policy includes IPR declaration forms that ETSI members use when they declare IPRs as potentially essential and commit to licensing such IPRs on FRAND terms and conditions.  In particular, the IPR Information Statement and Licensing

12

Declaration must be signed by a person with authority to bind the member company and its affiliates, and provides the option for the company to "irrevocably declare[]" that it is "prepared to grant irrevocable licenses" on FRAND terms and conditions to those who practice the standard:

> the Declarant hereby irrevocably declares that (1) it and its AFFILIATES are prepared to grant irrevocable licenses under its/their IPR(s) on terms and conditions which are in accordance with Clause 6.1 of the ETSI IPR Policy, in respect of the STANDARD(S), TECHNICAL SPECIFICATION(S), or the ETSI Project(s), as identified above, to the extent that the IPR(s) are or become, and remain ESSENTIAL to practice that/those STANDARD(S) or TECHNICAL SPECIFICATION(S) . . . ; and (2) it will comply with Clause 6.1bis of the ETSI IPR Policy with respect to such ESSENTIAL IPR(s).

32.     Clause 14 of the ETSI IPR Policy further provides that any violation of the policy by a member "shall be deemed to be a breach by that MEMBER of its obligations to ETSI."

33.     As discussed below, Datang, on its own behalf and/or by and through CATT and/or CICT, voluntarily submitted irrevocable IPR licensing declarations with respect to each of the patents addressed in this Complaint.  That is, Datang represented to ETSI and its members that the patents may be, or may become, essential to practice of ETSI/3GPP standards and that it would license them on FRAND terms and conditions.  Implicit in such a declaration is that the patent is valid, as an invalid patent cannot be "essential" to practice of a standard.

34.     The construction, validity, and performance of Datang's IPR declarations are governed by the laws of France.  Such declarations create binding contractual commitments with ETSI as to which other ETSI members and implementers of 3GPP standards are third-party beneficiaries.  Patents that are the subject of such declarations, including the U.S. patents at issue in this action, often are referred to as "FRAND-encumbered" patents, and those who practice the corresponding standards are entitled to license them on FRAND terms and conditions.

35.     Relying on the integrity of the SSO process and the commitments made by ETSI

13

members, including Datang, regarding the IPRs they deem essential, Samsung developed, marketed, and sold mobile devices with, for example, 4G and 5G connectivity globally and in the United States.

36. Samsung has invested substantial resources in developing and marketing products that implement these standards worldwide, including in the United States. Samsung did so in reliance on assurances of participating IPR holders—including Datang—that its U.S. patents identified pursuant to ETSI's IPR Policy by such IPR holders would be licensed on FRAND terms and conditions. Accordingly, Samsung is a third-party beneficiary of Datang's FRAND commitments to ETSI and 3GPP.

**C.**   ████████████   **Between Datang and Samsung**

37. In May 2020, ████████████████████████████████████
████████████████████████████████████████. Samsung offers and sells a wide range of smartphones and other cellular products globally and in the United States that implement ETSI standards. Samsung is a willing licensee, has at all times been a willing licensee, and desires to license Datang's patents, including its U.S. patents, that are essential to the ETSI standards on FRAND terms and conditions.

38. Despite Samsung's willingness, Datang has ████████████████████ its patents that are declared essential to the ETSI standards, including its U.S. 4G- and 5G-related patents. At the same time Datang ███████████████████, Datang concluded a license agreement with Apple that, on information and belief, ████████████████████ terms and conditions for Apple's use of the covered patents ███████████████████ ████████████████████ Samsung's use of Datang's 4G- and 5G-related patents. Compounding the impropriety of Datang's conduct, Datang has ███████████████████ ████ threat of injunctions in China ████████████████████████

14

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████ its U.S. patents that are 4G- and 5G-related to Samsung on terms and conditions that are FRAND.  Datang has, thus, breached the FRAND obligation attached to its U.S. patents that are 4G- and 5G-related.

39.   Specifically as to the Apple license, a prospectus document from about September 2022 relating to an initial public offering for Datang's parent, CICT, stated (as translated from Mandarin (original attached in relevant part as Exhibit B and translation of relevant paragraph attached as Exhibit C)):

> On December 22, 2021, Datang Mobile and SISVEL INTERNATIONAL S.A signed the "Revised and Restated Project Specific Patent License Agreement," which stipulated that the standard essential patents for mobile communications held by Datang Mobile shall be licensed to Apple Inc. (APPLE) for its use, and the patent license amount was 95 million US dollars.

40.   Despite entering into the agreement with Apple in late 2021 while ████████

████████████████████████████████████████ Samsung of the terms of that license, and instead Samsung only learned of the above discussion of the Apple agreement on its own in late 2022.  On information and belief, the patent rights that Datang granted to Apple include rights to ████████ declared essential patents and U.S. patent rights ████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████. In this manner, on information and belief, the Apple agreement is a comparable license for purposes of ████████████████████████.

41.   On information and belief, Datang knew or should have known the Apple license is highly relevant ████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

████████████████████████████████ Samsung's comparably much smaller use of Datang's

4G- and 5G-related patents as compared to Apple's use of those patents.

42.    On information and belief, Datang has not entered into any other licenses with

similarly-situated companies for its declared cellular standard essential patents.  Thus, on

information and belief, the Apple agreement provides the only market-based data point from

which the FRAND-ness ████████████████████ can be judged.

43.    Based on industry reports, Samsung in recent years has had less than half of the

sales revenues for smartphones and other cellular products compared to Apple, including about

one-third that of Apple in the United States.  Samsung's sales are also heavily concentrated in

countries and regions where Datang's patent coverage is comparatively weaker or non-existent

compared Apple's sales geographies, including especially in China where, on information and

belief, all or substantially all Apple devices are manufactured, Apple has a substantial portion of

its sales, and where Samsung has only a small fraction of the sales compared to Apple.  Samsung

also sells a wider range of cellular devices (from entry- or mid-level (e.g., Galaxy A-series) to

flagship products (e.g., Galaxy S-series)) both globally and in the United States, compared to

Apple's focus on the premium, flagship market segment.  However, despite Samsung's

substantially smaller use of Datang's patents globally and in the United States, ███████

███████████████████████████████████████████████████████

████████████████████████████ Apple paid for its greater use of Datang's 4G- and 5G-related

patents.

44.    In this manner, Datang's ██████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████ not compliant with FRAND, including in particular the non-discrimination obligation, and breach Datang's duty and obligation to negotiate in good faith.  This is all the more so given that Apple's U.S. sales of smartphones and cellular devices greatly exceed that of Samsung.

45.     Further compounding Datang's breach of its FRAND obligation and duty to negotiate in good faith, Datang has ███████████████████████████████████ ████████████████████████████████████████ ███████████████████████████ for a license to Datang's U.S. 4G- and 5G-related patents.

46.     In China, for example, Datang filed both infringement and rate setting actions in December 2022, which in addition to seeking to have the Fuzhou Intermediate People's Court set both world-wide and China-only rates for Datang's 4G- and 5G-related patents, also seek injunctions on declared essential patents.  Datang filed these suits ██████████████ ███████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████ ██████ and despite, on information and belief, a unilateral request by a patentee located in China for world-wide rate-setting in Chinese courts being without precedent.

47.     Notwithstanding Datang having brought FRAND-related actions in China under the law applicable in Chinese courts, ███████████████████████████ ████████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████ .

48.     The use or threat of injunctions to seek hold-up or discriminatory royalties is contrary to FRAND principles, violates the duty to negotiate in good faith, and is contrary to applicable U.S. law and policy governing injunctions as set forth, for example, in *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006) and *Apple v. Motorola*, 757 F.3d 1286 (Fed. Cir. 2014). ██████████████████████, Datang has breached its FRAND commitment and its obligation to negotiate in good faith.

49.     In both China and ████████, Datang has brought actions directed to or implicating whether ████████ have complied with FRAND in view of and under those respective jurisdictions' applicable laws and according to the discovery and process available in those jurisdictions.  Samsung is defending itself in both China and ████████ based on the available claims and defenses in those jurisdictions under their applicable laws and available process and procedures, including ████████████████████████████████████ ████████████████████.[3]  But given Datang's conduct and given that, outside of China, Datang's U.S. patents represent its largest portfolio of 4G- and 5G-related patents, it has become necessary and important for Samsung to bring this suit to vindicate its U.S. rights and adjudicate the parties' disputes and Samsung's breach claims involving Datang's U.S. patents and the FRAND commitment attached to them.[4]

---

[3] ████████████████████████████████████████████ ████████████████████████████████████████████████████ ██████████████████████████████████████ and counsel for Samsung in this suit is hopeful that, under suitable confidentiality protections, Datang will promptly produce the Apple license in this case.

[4] For avoidance of doubt, through this action, Samsung seeks to have its U.S. rights and claims

50.     The patents at issue in this action are, on information and belief, representative of the strength or lack thereof of Datang's U.S. patents rights and are invalid for seeking to claim the technology of others or obvious variants of technology from others. ████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████ Datang provided to Apple for Apple's use of Datang's patents.

████████████████████ a license to Datang's 4G- or 5G-related U.S. patent on fair, reasonable, or non-discriminatory terms, and Datang has breached its FRAND obligation and its obligation to negotiate with Samsung in good faith.

51.     By contrast to ████████████, Samsung has been and remains a willing licensee, and has ████████████████████ to Datang's patents that are essential to cellular standards.  Despite Datang's refusal to date ████████████

████████████████████████████████████

████████████████████████████████████

████████████████████. Based on the apparent effective royalties from the Apple license as applied to Samsung's comparatively smaller use of Datang's patents, ████████ are well within, if not exceed, the FRAND range for a license to Datang's cellular standard essential patents.

---

adjudicated, and Samsung is not seeking and will not seek an "antisuit injunction" or "anti-inference injunction" in relation to the FRAND-related proceedings Datang brought in ████████ or China.

D.     **The Datang Patents-in-Suit**

52.     The patents challenged here represent the strength and value or lack thereof of Datang's portfolio of declared essential U.S. patents that concern 4G and 5G.  Given Datang's and its parent or affiliated companies CATT and/or CICT's immersion in the standardization process, including its participation in 3GPP working groups, Datang cannot, on information and belief, credibly contend that it was unaware that its patents derive from the work of others.

53.     Datang purports to be the owner of U.S. Patent No. 9,125,071 ("the '071 patent"). On September 1, 2015, the '071 patent, entitled "Method, System and Apparatus for Measuring Interference," issued to Quibin Gao and Xin Su.  The '071 patent includes 19 claims.  Of these, claims 1, 8, 12, and 17 are independent.  A copy of the '071 patent is attached to this Complaint as Exhibit D.

54.     CATT is named as the assignee on the face of the '071 patent.  On information and belief, on or around June 22, 2021, CATT purported to assign the '071 patent to Datang.  A copy of this assignment was recorded with the United States Patent Office on July 16, 2021, and is attached hereto as Exhibit E.

55.     Datang, in its own name and/or by and through its parent or affiliated companies CATT and/or CICT, declared the '071 patent to be potentially essential to the 4G standard and in fact ███████████████████████████.  This patent was filed as U.S. Application No. 13/700,983 on November 29, 2012, and is the U.S. national phase of the International Patent Application No. PCT/CN2011/079518, filed on September 9, 2011.  The '071 patent also claim priority to Chinese patent application CN 201010280130, filed on September 10, 2010.

56.     Datang purports to be the owner of U.S. Patent No. 9,585,107 ("the '107 patent"). On February 28, 2017, the '107 patent, entitled "PHR Processing Method and Device in Carrier Aggregation System," issued to Fangli Xu and Yali Zhao.  The '107 patent includes 6 claims.  Of

these, claims 1 and 5 are independent.  A copy of the '107 patent is attached to this Complaint as Exhibit F.

57.    CATT is named as the assignee on the face of the '107 patent.  On information and belief, on or around June 9, 2021, CATT purported to assign the '107 patent to Datang.  A copy of this assignment was recorded with the United States Patent Office on July 6, 2021, and is attached hereto as Exhibit G.

58.    Datang, in its own name and/or by and through its parent or affiliated companies CATT and/or CICT, declared the '107 patent to be potentially essential to the 4G and 5G standards and in fact ███████████████████████.  This patent was filed as U.S. Application No. 13/691,752 on December 1, 2012, and claims the benefit of Chinese Patent Application No. 201010299887, filed September 29, 2010.

59.    Datang purports to be the owner of U.S. Patent No. 10,785,808 ("the '808 patent").  On September 22, 2020, the '808 patent, entitled "Random access method and equipment," issued to Yali Zhao and Fangli Xu.  The '808 patent includes 17 claims.  Of these, claims 1 and 10 are independent.  A copy of the '808 patent is attached to this Complaint as Exhibit H.

60.    CATT is named as the assignee on the face of the '808 patent.  On information and belief, on or around June 22, 2021, CATT purported to assign the '808 patent to Datang.  A copy of this assignment was recorded with the United States Patent Office on July 16, 2021, and is attached hereto as Exhibit E.

61.    Datang, in its own name and/or by and through its parent or affiliated companies CATT and/or CICT, declared the '808 patent to be potentially essential to the 4G and 5G standards and in fact ████████████████████.  This patent was filed as

U.S. Application No. 15/580,551 on March 22, 2016, and claims the benefit of Chinese Patent

Application No. 201510312744, filed on June 9, 2015.

62.     Datang purports to be the owner of U.S. Patent No. 11,057,923 ("the '923

patent").  On July 6, 2021, the '923 patent, entitled "Transmission Method, Terminal Device and

Base Station," issued to Xuejuan Gao, Ekpenyong Tony, and Fang-Chen Cheng.  As of the filing

of this Complaint, the '923 patent includes 16 claims.  Of these, claims 1, 6, 10, and 14 are

independent.  A copy of the '923 patent is attached to this Complaint as Exhibit I.

63.     CATT is named as the assignee on the face of the '923 patent.  On information

and belief, on or around June 22, 2021, CATT purported to assign the '923 patent to Datang.  A

copy of this assignment was recorded with the United States Patent Office on July 16, 2021, and

is attached hereto as Exhibit E.

64.     Datang, in its own name and/or by and through its parent or affiliated companies

CATT and/or CICT, declared the '923 patent to be potentially essential to the 5G standard and in

fact ███████████████████████████.  This patent was filed as U.S. Application No.

16/611,202 on March 29, 2018, and is the U.S. national phase of the International Patent

Application No. PCT/CN2018/081161, filed on March 29, 2018.  The '923 patent also claims

priority to Chinese Patent Application No. 201710314182, filed on May 5, 2017.

65.     As indicated above, Datang has sought and obtained patents on other companies'

technology, or obvious variants thereof, including through its monitoring of and participation in

3GPP working groups.  Such patents include the '107 and '923 patents that are subject to this

Complaint.

66.     With respect to the '107 patent, on information and belief, the concept of "power

headroom reporting (PHR)" had been incorporated into generation(s) of the 4G standard that

predate the '107 patent.  For example, the 3GPP TS 36.321 version 9.3.0 (Release 9) specification published in July 2010 had an entire section devoted to "Power Headroom Reporting."  *See, e.g.*, Ex. J, § 5.4.6.  A copy of this specification is attached hereto as Exhibit J. While many of the core features of PHR had been settled months before the '107 patent, the industry at the time contemplated different options relating to the use of PHR in carrier aggregation ("CA") systems.  On information and belief, these discussions often occurred via a group-email reflector (or Listserv).  For example, a technical contribution submitted by Ericsson around July of 2010 summarized the "email discussion . . . LTE CA: PHR Handling."  A copy of this technical contribution is attached hereto as Exhibit K.

67.    On information and belief, one issue being discussed at the time was whether to implement the PHR timers on a ***per component carrier*** ("***per CC***") basis or on a ***per user equipment*** ("***per UE***") basis.

### 2.3.1 periodicPHR-Timer

In Rel-8/9, a PHR report is triggered when the *periodicPHR-Timer* expires. The following options for setting it have been identified:

**Alternative 1: One timer per CC**

Each UL CC would be configured with its own timer value and each UL CC would start/restart its timer individually. The timer value could be the same or different for each UL CC. Upon timer expiry, PHR would be triggered for the UL CC associated with the timer.

**Alternative 2: One timer per UE**

There would be one timer instance per UE. This timer would have one value and upon expiry, PHR would be triggered for any UL CCs which shall report PHR (depending on decision in 2.2)

### 2.3.3 prohibitPHR-Timer

This parameter is used in combination with *dl-PathlossChange* and the following options for setting it have been identified:

**Alternative 1: One timer per CC**

Each UL CC would be configured with its own timer value and each UL CC would start/restart its timer individually. The timer value could be the same or different for each UL CC. Upon timer expiry, PHR would be triggered for the UL CC(s) associated with the timer.

**Alternative 2: One timer per UE – report for all UL CCs**

There would be one timer instance per UE. This timer would have one value and upon expiry, if the *dl-PathlossChange* threshold has been exceeded by at least one DL CC, PHR would be triggered for any UL CCs which shall report PHR (depending on decision in 2.2).

*See, e.g.*, Exhibit K at §§ 2.3.1 and 2.3.3.

68.     Datang's parent or affiliated company, CATT, supported the "one timer *per CC*" approach at these 3GPP meetings, whereas other companies such as Ericsson supported the "one timer *per UE*" approach.

| *periodicPHR-Timer* | |
| --- | --- |
| Company name | Preferred solution/Motivation/Reasoning |
| Ericsson & ST-Ericsson | **One timer per UE.** Since we think that all UL CCs should always report PHR at the same time, one timer per UE should be used. Having a single timer also seems like the least complex solution. |
| Hitachi | Alternative 1. Also the same timer value is sufficient and simple, and thus only a single value should be configured and applied to all CC's |
| Panasonic | Alternative 2. One periodicPHR-timer per UE is sufficient in our opinion. Upon expiry of this timer, PHR would be triggered for all configured (respectively active) UL CCs. |
| CATT | Alternative 1. We agree with Hitachi. |

| *prohibitPHR-Timer* | |
| --- | --- |
| Company name | Preferred solution/Motivation/Reasoning |
| Ericsson & ST-Ericsson | **One timer per UE – report for all UL CCs.** If one DL CC has exceeded the pathloss change since the last PHR report, it is very likely that one or more other DL CCs are close to exceeding the threshold. Therefore it would make sense to report PHR for all UL CCs, even though only one DL CC may have exceeded the threshold, in order to avoid that some UL CCs will have a very large DL pathloss change by the next time the timer is triggered. Due to independent TPC errors PHR can be different even for adjacent CC that experience similar pathloss changes. |
| Hitachi | Alternative 1. We think reporting should be per CC, therefore maintenance of prohibit timer should be also per CC. However, the same timer value is sufficient and simple, and thus only a single value should be configured and applied to all CC's |
| Panasonic | Alternative2. One prohibitPHR-timer per UE is sufficient in our view. PH should be reported for all UL CCs. |
| CATT | Alternative 1. We agree Hitachi. |

*See id.*

69.     Two months after this meeting, however, CATT filed the Chinese counterpart patent application to the '107 patent claiming to have invented the *periodicPHR-Timer* and *prohibitPHR-Timer* on a "*per UE*" basis.  For example, independent claim 1 of the '107 patent recites, *inter alia*, "wherein a prohibitPHR-Timer and a periodicPHR-Timer are *maintained per user equipment* . . . ." (emphasis added).

70.     With respect to the '923 patent, its specification explains that prior art LTE systems use a Transport Block ("TB") as a unit of transmission and that the TB may be segmented into smaller code blocks ("CBs").  Ex. I at 1:17-25, 1:40-41.  The patent states that LTE systems include "1-bit ACK[5]/NACK[6] feedback information" for a TB, such that error in decoding a single CB causes a NACK that results in retransmission of the entire TB.  *Id*. at 1:55-57.  The '923 patent further states that "[a] 5G system supports more diversified and complex data transmission," such that the foregoing "TB-based transmission and ACK/NACK feedback mechanism that is applied to the LTE system" is not sufficient for 5G.  *Id*. at 1:57-67.  Thus, the '923 patent purports to provide "retransmission and ACK/NACK feedback" in which there are multiple bits of ACK/NACK feedback information that correspond to a group of CBs, called a Code Block Group ("CBG").  *Id*. at 2:1-3, 2:7-11.

71.     On information and belief, prior to the earliest priority date of the '923 patent, multiple companies—including Samsung—discussed using multiple feedback bits corresponding to CBGs to indicate whether a CBG is retransmitted or not transmitted.

---

[5]  "ACK" is short for "acknowledgment" and is a common signal that is passed between communication processes to indicate that data has been correctly received.

[6]  "NACK" is short for "non-acknowledgment" or "negative acknowledgment" and is a common signal that is passed between communication processes to indicate that data has not been successfully received.

72.     For example, at a 3GPP working group meeting in Athens, Greece that occurred between February 13-17, 2017, Samsung proposed a "CB-group based re-transmission" with "multi-bit HARQ-ACK feedback."

## Agreements in RAN1-NR#1

- RAN1 will down select following options to utilize HARQ-ACK feedback with more than one bit per TB until the next meeting
  - Option 1: CB-group based re-transmission (Samsung)
  - Option 2: Decoder state information feedback (Nokia)
  - Option 3: CB-level outer erasure code (Qualcomm)
  - Option 4: Any combination of Option 1-3
  - Other options are not precluded

## Proposal

- CB or CBG-based retransmission with multi-bit HARQ-ACK feedback is supported in Rel-15, which shall have the following characteristics:
  - Minimize impact on RAN2 (e.g., only allow CB or CBG based re-transmission for the same TB of a HARQ process)
  - Note: This does not preclude parity encoded CB/CBG retransmission

*See, e.g.*, Exhibit L at 2-3.

73.     As another example, at a 3GPP working group meeting in Spokane, Washington that occurred between April 3-7, 2017, Samsung again proposed a "CBG-based re-transmission" with "multi-bit HARQ-ACK feedback," and provided additional details regarding "how to form [a] CBG," how to send "multiple HARQ-ACK feedback," and "how to indicate which CBG's are being retransmitted":

**3GPP TSG RAN WG1 Meeting #88bis**
**Spokane, USA, 3rd – 7th April 2017**

R1-1705401

| | |
|---|---|
| **Agenda Item:** | 8.1.3.3.2 |
| **Source:** | Samsung |
| **Title:** | Overview of CBG-based retransmission in NR |
| **Document for:** | Discussion and decision |

## 2   Discussions

To support CBG-based retransmission, several issues need to be investigated, e.g.,

- how to form CBG,
- how UE sends single/multiple HARQ-ACK feedback, and
- how to indicate which CBG's are being retransmitted.

*See, e.g.*, Exhibit M at 1.

74.   On information and belief, CATT also attended the February and April 2017

working group meeting and was aware of Samsung's CB-group based retransmission proposal:

**3GPP TSG RAN WG1 Meeting #88**
**Athens, Greece, 13th - 17th February 2017**

R1-1702101

| | |
|---|---|
| **Source:** | CATT |
| **Title:** | Discussion on HARQ enhancements for NR |
| **Agenda Item:** | 8.1.3.3.1 |
| **Document for:** | Discussion and Decision |

## 1   Introduction

Several enhancements to HARQ operation have been proposed for the New Radio (NR) air interface. One such enhancement is the support of multiple HARQ-ACK feedback bits per transport block (TB). This feature was discussed at the NR ad-hoc meeting with the following conclusion [1],

**Agreements:**

- HARQ-ACK feedback with one bit per TB is supported.
- RAN1 will down select following options to utilize HARQ-ACK feedback with more than one bit per TB until the next meeting
  - Option 1: CB-group based re-transmission (Samsung)
  - Option 2: Decoder state information feedback (Nokia)
  - Option 3: CB-level outer erasure code (Qualcomm)
  - Option 4: Any combination of Option 1-3
  - Other options are not precluded
- Note that if RAN1 will not reach consensus in the next meeting, no support of utilization HARQ-ACK feedback with more than one bit per TB in Rel-15

*See, e.g.*, Exhibit N at 1.

```
3GPP TSG RAN WG1 Meeting #88bis                                    R1-17xxxxx
Spokane, USA 3ʳᵈ - 7ᵗʰ April 2017
Agenda Item: 8.1.3.3.2



                          WF on HARQ operation



                          LG Electronics, CATT
```

*See, e.g.*, Exhibit O at 1.

75.     Despite being aware that Samsung and other companies in the working group
were discussing CBG-based retransmission and ACK/NACK feedback, one month after the
April 2017 meeting, CATT filed the Chinese patent application to which the '923 patent claims
priority, and claimed to invent CBG-based retransmission: "Embodiments of this application
provide a transmission method, a terminal device, and a base station, to resolve a technical
problem that there is no CBG-based method for performing retransmission and ACK/NACK
feedback in the related art."  Ex. I at 2:1-3, 2:7-11.

76.     Notwithstanding Datang's pattern of patenting other companies' technology,
Datang continues to insist that ████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████, based on Samsung's U.S. sales of 4G-
and 5G-compliant products.

77.     The United States is a substantial market for Samsung's 4G- and 5G-compliant mobile devices.  As a result, the validity of the challenged Datang patents is material to determining the royalties that Datang may be owed for a license to any valid and essential 4G and 5G patents that it may own.

## CLAIMS FOR RELIEF

## COUNT I

## (Declaratory Judgment of Invalidity of U.S. Patent No. 9,125,071)

78.     Samsung repeats and realleges each and every allegation contained in the paragraphs above as if fully set forth herein.

79.     The claims of the '071 patent are invalid for failure to comply with and/or satisfy one or more of the conditions and requirements of patentability specified in Title 35 of the United States Code, including but not limited to 35 U.S.C. §§ 101, 102, 103, and 112.

80.     The claims are invalid, for example, under 35 U.S.C. § 101.  For example, Claim 8 of the '071 patent is invalid pursuant to 35 U.S.C. §101, in part, because it recites an abstract idea, but fails to claim any inventive concept to transform the abstract idea into something patentable.

81.     The claims are also invalid, for example, under pre-AIA 35 U.S.C. §§ 102 and/or 103 because they are fully anticipated by the prior art and would have at a minimum been obvious at the time the alleged invention was made to a person having knowledge of such prior art and having ordinary skill in the art to which the claimed subject matter pertains.

82.     For example, U.S. Patent Publication No. 2009/0092059 to I-Kang Fu ("Fu") was originally assigned to "Media Tek Inc" and entitled "Interference Measurement Mechanism for Frequency Reuse in Cellular OFDMA Systems."  Fu has a filing date of October 15, 2008, and is prior art to the '071 patent at least under pre-AIA 35 U.S.C. § 102(e).  The Fu reference

anticipates and/or renders the claims of the '071 patent obvious either alone or in combination with other prior art references, as shown in the exemplary claim chart that analyzes the invalidity of claim 8, attached hereto as Exhibit P and incorporated by reference.[7]

83.    By way of additional example, U.S. Publication No. 2009/0268630 A1 ("Yellin") was filed on March 30, 2009 and published on October 29, 2009.  It is therefore prior art under at least pre-AIA 35 U.S.C. § 102(b).  The Yellin reference anticipates and/or renders the claims of the '071 patent obvious either alone or in combination with other prior art references.

84.    The claims are also invalid, for example, for failure to meet the legal requirements of 35 U.S.C. § 112 because they do not contain a written description of the alleged invention in such full, clear, concise, and exact terms as required by the statutes of the United States to enable any person skilled in the art to practice the invention purported to be covered thereby.  Further, the '071 patent does not inform those skilled in the art about the scope of the invention with reasonable certainty and it does not particularly point out and distinctly claim the subject matter of the alleged invention, as required by 35 U.S.C. § 112.

85.    As a result of the acts described in the foregoing paragraphs, there exists a substantial controversy of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

86.    A judicial declaration is necessary and appropriate so that Samsung may ascertain its rights regarding the '071 patent.

87.    Samsung is entitled to a judicial declaration that the '071 patent is invalid.

---

[7] Exhibit P is an exemplary claim chart showing specifically where each limitation of claim 8 of the '071 patent is found in Fu on a limitation-by-limitation basis.  Samsung reserves the right to modify this exemplary chart as litigation proceeds and challenge the validity of all or other claims of the '071 patent, for example when Samsung serves further invalidity contentions during the discovery or expert report process.

## COUNT II

### (Declaratory Judgment of Invalidity of U.S. Patent No. 9,585,107)

88.     Samsung repeats and realleges each and every allegation contained in the paragraphs above as if fully set forth herein.

89.     The claims of the '107 patent are invalid for failure to comply with and/or satisfy one or more of the conditions and requirements of patentability specified in Title 35 of the United States Code, including but not limited to 35 U.S.C. §§ 101, 102, 103, and 112.

90.     The claims are invalid, for example, under pre-AIA 35 U.S.C. §§ 102 and/or 103 because they are fully anticipated by the prior art and would have at a minimum been obvious at the time the alleged invention was made to a person having knowledge of such prior art and having ordinary skill in the art to which the claimed subject matter pertains.

91.     For example, 3GPP TS 36.321 version 9.3.0 (Release 9) is entitled "LTE; Evolved Universal Terrestrial Radio Access (E-UTRA); Medium Access Control (MAC) protocol specification" and was published by July 2010 ("TS 36.321 ver. 9.3.0").  As a further example, Contribution Document R2-103580 is entitled "Summary of e-mail discussion [70#15] LTE CA: PHR Handling" and was published by July 2010 ("Ericsson").  The TS 36.321 ver. 9.3.0 and the Ericsson reference are prior art to the '107 patent at least under pre-AIA 35 U.S.C. § 102(a).  The TS 36.321 ver. 9.3.0 reference anticipates and/or renders the claims of the '107 patent obvious either alone or in combination with other prior art references, such as Ericsson, as shown in the exemplary claim chart that analyzes the invalidity of claim 1, attached hereto as Exhibit Q and incorporated by reference.[8]

_____

[8]  Exhibit Q is an exemplary claim chart showing specifically where each limitation of claim 1 of the '107 patent is found in the prior art references on a limitation-by-limitation basis.  Samsung reserves the right to modify this exemplary chart as litigation proceeds and challenge the validity of all or other claims of the '107 patent, for example when Samsung serves further invalidity

92.     By way of additional example, 3GPP published a "Details on PHR Reporting" document, labeled R2-102960, in May 2010, and is therefore prior art under at least pre-AIA 35 U.S.C. § 102(a).  This reference anticipates and/or renders the claims of the '107 patent obvious either alone or in combination with other prior art references.

93.     The claims are also invalid, for example, for failure to meet the legal requirements of 35 U.S.C. § 112 because they do not contain a written description of the alleged invention in such full, clear, concise, and exact terms as required by the statutes of the United States to enable any person skilled in the art to practice the invention purported to be covered thereby.  Further, the '107 patent does not inform those skilled in the art about the scope of the invention with reasonable certainty and it does not particularly point out and distinctly claim the subject matter of the alleged invention, as required by 35 U.S.C. § 112.

94.     As a result of the acts described in the foregoing paragraphs, there exists a substantial controversy of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

95.     A judicial declaration is necessary and appropriate so that Samsung may ascertain its rights regarding the '107 patent.

96.     Samsung is entitled to a judicial declaration that the '107 patent is invalid.

## COUNT III

### (Declaratory Judgment of Invalidity of U.S. Patent No. 10,785,808)

97.     Samsung repeats and realleges each and every allegation contained in the paragraphs above as if fully set forth herein.

98.     The claims of the '808 patent are invalid for failure to comply with and/or satisfy

---

contentions during the discovery or expert report process.

one or more of the conditions and requirements of patentability specified in Title 35 of the

United States Code, including but not limited to 35 U.S.C. §§ 101, 102, 103, and 112.

99.     The claims are invalid under 35 U.S.C. § 101.  For example, claim 1 of the '808

patent is invalid pursuant to 35 U.S.C. § 101, in part, because it recites an abstract idea, but fails

to claim any inventive concept to transform the abstract idea into something patentable.

100.    The claims are also invalid, for example, under AIA 35 U.S.C. §§ 102 and/or 103

because they are fully anticipated by the prior art and would have at a minimum been obvious at

the time the alleged invention was made to a person having knowledge of such prior art and

having ordinary skill in the art to which the claimed subject matter pertains.

101.    For example, U.S. Patent No. 10,034,308 to Lee et al. ("Lee") is assigned to "LG

Electronics Inc."  It is entitled "Method for Allocating Temporary Identifier to Terminal in

Random Access Procedure in Wireless Communication System and Apparatus Therefor" and has

a filing date of February 12, 2015.  Lee claims priority to United States Provisional Patent

Application Serial No. 61/951,477, filed on March 11, 2014, and is prior art under at least AIA

35 U.S.C. § 102(a)(2).  The Lee reference anticipates and/or renders the claims of the '808 patent

obvious either alone or in combination with other prior art references, as shown in the exemplary

claim chart that analyzes the invalidity of claim 1, attached hereto as Exhibit R and incorporated

by reference.[9]

102.    By way of additional example, U.S. Patent No. 8,885,528 to Lin et al. ("Lin") was

filed on June 15, 2011 and issued on November 11, 2014.  It is therefore prior art under at least

---

[9] Exhibit R is an exemplary claim chart showing specifically where each limitation of claim 1 of
the '808 patent is found in Lee on a limitation-by-limitation basis.  Samsung reserves the right to
modify this exemplary chart as litigation proceeds and challenge the validity of all or other
claims of the '808 patent, for example when Samsung serves further invalidity contentions
during the discovery or expert report process.

AIA 35 U.S.C. § 102(a)(1).  The Lin reference anticipates and/or renders the claims of the '808

patent obvious either alone or in combination with other prior art references.

103.    The claims are also invalid, for example, for failure to meet the legal requirements

of 35 U.S.C. § 112 because they do not contain a written description of the alleged invention in

such full, clear, concise, and exact terms as required by the statutes of the United States to enable

any person skilled in the art to practice the invention purported to be covered thereby.  Further,

the '808 patent does not inform those skilled in the art about the scope of the invention with

reasonable certainty and it does not particularly point out and distinctly claim the subject matter

of the alleged invention, as required by 35 U.S.C. § 112.

104.    As a result of the acts described in the foregoing paragraphs, there exists a

substantial controversy of sufficient immediacy and reality to warrant the issuance of a

declaratory judgment.

105.    A judicial declaration is necessary and appropriate so that Samsung may ascertain

its rights regarding the '808 patent.

106.    Samsung is entitled to a judicial declaration that the '808 patent is invalid.

## COUNT IV

### (Declaratory Judgment of Invalidity of U.S. Patent No. 11,057,923)

107.    Samsung repeats and realleges each and every allegation contained in the

paragraphs above as if fully set forth herein.

108.    The claims of the '923 patent are invalid for failure to comply with and/or satisfy

one or more of the conditions and requirements of patentability specified in Title 35 of the

United States Code, including but not limited to 35 U.S.C. §§ 101, 102, 103 and 112.

109.    The claims are invalid under 35 U.S.C. § 101.  For example, Claim 10 of the '923

patent is invalid pursuant to 35 U.S.C. § 101, in part, because it recites an abstract idea, but fails

to claim any inventive concept to transform the abstract idea into something patentable.

110.    The claims are also invalid, for example, under AIA 35 U.S.C. §§ 102 and/or 103 because they are fully anticipated by the prior art and would have at a minimum been obvious at the time the alleged invention was made to a person having knowledge of such prior art and having ordinary skill in the art to which the claimed subject matter pertains.

111.    For example, International Publication No. WO 2018/145,078 to Gang Xiong *et al.* ("Xiong") is assigned to "Intel IP Corporation." It is entitled "Retransmission Mechanisms For CBG-Based HARQ Operations" and has an international filing date of February 6, 2018. Xiong claims priority to United States Provisional Patent Application Serial No. 62/455,214, filed on February 6, 2017, and is prior art to the '923 patent under at least AIA 35 U.S.C. § 102(a)(2). The Xiong reference anticipates and/or renders the claims of the '923 patent obvious either alone or in combination with other prior art references, as shown in the exemplary claim chart that analyzes the invalidity of claim 10, attached hereto as Exhibit S and incorporated by reference.[10]

112.    By way of additional example, International Publication No. WO 2018/203406 A1 ("Takeda") was filed on May 2, 2017 and published on November 8, 2018. It is therefore prior art under at least AIA 35 U.S.C. § 102(a)(2). The Takeda reference anticipates and/or renders the claims of the '923 patent obvious either alone or in combination with other prior art references.

113.    The claims are also invalid, for example, for failure to meet the legal requirements

---

[10] Exhibit S is an exemplary claim chart showing specifically where each limitation of claim 10 of the '923 patent is found in Xiong on a limitation-by-limitation basis. Samsung reserves the right to modify this exemplary chart as litigation proceeds and challenge the validity of all or other claims of the '923 patent, for example when Samsung serves further invalidity contentions during the discovery or expert report process.

of 35 U.S.C. § 112 because they do not contain a written description of the alleged invention in such full, clear, concise, and exact terms as required by the statutes of the United States to enable any person skilled in the art to practice the invention purported to be covered thereby.  Further, the '923 patent does not inform those skilled in the art about the scope of the invention with reasonable certainty and it does not particularly point out and distinctly claim the subject matter of the alleged invention, as required by 35 U.S.C. § 112.

114.    As a result of the acts described in the foregoing paragraphs, there exists a substantial controversy of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

115.    A judicial declaration is necessary and appropriate so that Samsung may ascertain its rights regarding the '923 patent.

116.    Samsung is entitled to a judicial declaration that the '923 patent is invalid.

## COUNT V

## (Breach of Contract)

117.    Samsung realleges and incorporates by reference the allegations set forth in the foregoing paragraphs.

118.    As set forth above, Datang has committed to license on FRAND terms and conditions any patent that is essential to practice a 3GPP standard, including the ETSI 4G and 5G standards, to all implementers of those standards.  Datang, in its own name and/or by and through its parent or affiliated companies CATT and/or CICT, has declared that the patents-in-suit are essential to the 4G and/or 5G standards and has submitted licensing declarations to ETSI for each, thus encumbering its rights regarding such patents.  To the extent Datang purports to be the assignee of additional patents that it contends are essential to the 4G and 5G standards and are the subject of FRAND commitments made to ETSI, Datang is bound by those contractual

commitments and obligations as well.

119.     As an implementer of the 3GPP specifications including the 4G and 5G standards, Samsung is an intended third-party beneficiary to and obtains the benefit of the contractual commitments and obligations of ETSI members, including Datang, with respect to each declared patent, including the patents-in-suit, to the extent necessary to practice a 3GPP standard.

120.     As a member of the cellular communications community and the public at large, Samsung is an intended third-party beneficiary to and obtains the benefit of the contractual commitments and obligations of ETSI members, including Datang, with respect to each declared patent, including the patents-in-suit, to the extent necessary to practice a 3GPP standard.

121.     Datang is obligated, under the French law FRAND commitments by which it is bound, to offer Samsung a license on FRAND terms and conditions and to negotiate in good faith towards a FRAND license with Samsung.  Yet, ███████████████████████████ ████████████████.

122.     At all times, Samsung is and has been willing to license any valid and essential patents that Datang may own on FRAND terms and conditions.  At all times, █████████ ████████████████████████████.

123.     Datang has breached its FRAND commitment involving its U.S. patents that are 4G- and 5G-related and FRAND-encumbered in multiple ways.  For example, ██ ███████████████████████████████████████████ ███████████████████████████████████████████ █████████████████████████████████████ █████████████████████████████████████ ███████.  The conduct alleged herein demonstrates that Datang has grown its U.S. patent

portfolio by seeking and obtaining patents on other companies' technology or obvious variants thereof.  This pattern of behavior is demonstrated by, but on information and belief is not limited to, Datang's conduct with respect to the U.S. patents-in-suit.  ██████████████████████

█████████████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████

███, on patents that Datang knows or should have known are invalid, Datang has breached its contractual obligation to license its FRAND-encumbered patents on FRAND terms, as set forth in IPR licensing declarations to ETSI and the ETSI IPR Policy that are binding on Datang.

124.    Apple is a competitor and a similarly-situated licensee for purposes of a comparable license analysis with Datang under applicable law, particularly given that, on information and belief, the Apple license provides the only market-based data point as to the value of Datang's 4G- and 5G-related patents.  By ███████████████ relevant and material terms of its license with Apple, including the terms that Samsung found on its own in the September 2022 CICT prospectus, and ████████████████████████

██████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

███████████.  In this manner, Datang has breached its contractual obligation to license its 4G- and 5G-related U.S. patents on FRAND terms and conditions, as set forth in IPR licensing declarations to ETSI and the ETSI IPR Policy that are binding on Datang.

125.    Further, by filing actions in China and ██████ against Samsung that request injunctive relief in order to prohibit Samsung from practicing certain patents that are declared are essential to practicing ETSI standards, █████████████████████████████████ its

38

promise to license its 4G- and 5G-related patents on FRAND terms, ████████████████ ████████████████████████████. This is particularly so given that with respect to the ████████████████, Datang ██████████████████████████████████████████ ████████████████████████████████████. By engaging in the conduct alleged herein and ████████████████████████ on, amongst other patents, its U.S. patents that are 4G- and 5G-related, Datang has breached its contractual obligation to license its portfolio on FRAND terms, as set forth in IPR licensing declarations to ETSI and the ETSI IPR Policy that are binding on Datang.

126.    As a result of these and other contractual breaches, Samsung has been injured in its business and property, is threatened by a lack of coverage from patent infringement protection, has been forced to expend resources involving Datang's patents that are invalid, defending itself against Datang's litigations and injunction requests, and ██████████████ █████████████████████████████████, and has suffered or faces the threat of increased costs, excessive non-FRAND royalties, loss of profits, loss of customers or potential customers, loss of goodwill and product image, uncertainty in business planning, and uncertainty among customers and potential customers.

## COUNT VI

### (Breach of Obligation to Negotiate in Good Faith)

127.    Samsung realleges and incorporates by reference the allegations set forth in the foregoing paragraphs.

128.    As set forth above, pursuant to Datang's French law FRAND commitments, ████ ████████████████████████████ Datang was obligated to negotiate in good faith towards a license on FRAND terms and conditions.  Datang ███████████████ ██████████████████████████████████████████

█████████████████████████████████ thus breached its obligation.  For example, Datang ████████████ material and relevant terms of the Apple license to Samsung, ████████████ ████████████████████████████████████ ████████████ relative to the Apple license, has ████████████████████, including the patents-in-suit, and █████████████████████████████████ ████████████████████████████████████████████ on Datang's 4G- and 5G-related U.S. patents.  This ████████████████ Samsung of a license to Datang's allegedly essential U.S. patents on FRAND terms and was not in good faith.

129.    Datang's ██████████████████ as relating to Datang's U.S. patents that are 4G- and 5G-related constitutes a breach of its obligation to negotiate in good faith with Samsung.

130.    As a result of Datang's breach of its duty to negotiate in good faith, Samsung has been injured in its business and property, including Samsung's cost and expenses ██████████ ████████████████, in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Samsung respectfully requests that this Court enter judgment in its favor as follows and award Samsung the following relief:

A.    Enter judgment in favor of Samsung;

B.    Declare that the '071 patent is invalid;

C.    Declare that the '107 patent is invalid;

D.    Declare that the '808 patent is invalid;

E.    Declare that the '923 patent is invalid;

F.    Adjudge and decree that Datang is liable for breach of contract for failing to comply with its FRAND obligations ██████████████████████████████

██████████████;

G.     Adjudge and decree that Datang breached its obligation under the ETSI IPR

Policy to negotiate in good faith ████████████████████████████████████

██████████████;

H.     Enter judgment against Datang for the amount of damages that Samsung proves at

trial, including, as appropriate, exemplary damages;

I.      Enter judgment awarding Samsung its expenses, costs, and attorneys' fees under

applicable laws;

J.      Award Samsung pre-judgment and post-judgment interest at the maximum

amount permitted by law; and

K.     Enter judgment for all other relief, in law or equity, as this Court deems just and

proper.

### DEMAND FOR JURY TRIAL

Samsung demands a jury trial on all claims and issues so triable.

Dated: October 31, 2023                    By:   _/s/ Brianna Lynn Silverstein_

                                           Christopher J. Burrell (*Pro Hac forthcoming*)
                                           Brianna Lynn Silverstein (VA Bar #78491)
                                           **FAEGRE DRINKER BIDDLE & REATH LLP**
                                           1500 K Street, NW
                                           Suite 1100
                                           Washington, DC 20005
                                           Tel: (202) 230-5000
                                           Fax: (202) 842-8465
                                           Christopher.Burrell@faegredrinker.com
                                           Brianna.Silverstein@faegredrinker.com

                                           Todd M. Briggs *(Pro Hac forthcoming)*
                                           **QUINN EMANUEL URQUHART &**
                                           **SULLIVAN LLP**
                                           555 Twin Dolphin Dr., 5th Floor

Redwood Shores, CA 94065
Tel: (650) 801 5000
Fax: (650) 801 5100
ToddBriggs@quinnemanuel.com

*Counsel for Plaintiffs Samsung Electronics Co., Ltd.*
*and Samsung Electronics America, Inc.*