**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | |
|---|---|
| SAMSUNG ELECTRONICS CO., LTD. & SAMSUNG ELECTRONICS AMERICA, INC., | |
| Plaintiffs, | Civil Action No. 1:23-cv-01488-MSN-LRV |
| v. | |
| DATANG MOBILE COMMUNICATIONS EQUIPMENT CO., LTD., | **DEMAND FOR JURY TRIAL** |
| Defendant. | |

**PLAINTIFFS' RESPONSIVE CLAIM CONSTRUCTION BRIEF**

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.    INTRODUCTION ............................................................................................................1

II.    THE COURT SHOULD GIVE DATANG'S EXPERT DECLARATIONS NO WEIGHT BECAUSE DATANG REFUSED TO MAKE ITS EXPERTS AVAILABLE FOR DEPOSITION ........................................................................1

III.    U.S. PATENT NO. 10,785,808 .....................................................................................3

     A.    "dedicated contention resource pool" (claims 1, 2, 3, 4, and 10) ..........................3

         1.    Datang Does Not Establish That a PRACH Is a "Dedicated Contention Resource Pool"....................................................................4

         2.    A PRACH Does Not Reasonably Inform the Scope of a "Dedicated Contention Resource Pool"....................................................................6

         3.    Datang Provides No Support for Its Proposed Construction .....................9

IV.    U.S. PATENT NO. 9,125,071 .....................................................................................10

     A.    "index" and "bitmap" (claims 2, 10, 13 and 19)................................................10

     B.    "interference" (claims 1, 2, 8, 10, 12, 13, 17 and 19)...........................................12

     C.    "first group of resource elements" / "first group of REs" (claims 1, 2, 8, 10, 12, 13, 17 and 19) ............................................................................13

V.    U.S. PATENT NO. 11,057,923 ...................................................................................14

     A.    "A*M-bit indication information" (claims 1, 5–6, 9–10 and 14) ........................14

     B.    "supports" / "does not support" (claims 2, 7, 11 and 15) .....................................16

VI.    CONCLUSION...........................................................................................................19

## **TABLE OF AUTHORITIES**

### **Cases**

*ActiveVideo Networks, Inc. v. Verizon Communs., Inc.*,
    694 F.3d 1312 (Fed. Cir. 2012)....................................................................................11

*Am. Med. Sys., Inc. v. Biolitec, Inc.*,
    618 F.3d 1354 (Fed. Cir. 2020)......................................................................................6

*Barkan Wireless Access Technologies, L.P. v. Cellco Partnership*,
    748 Fed.Appx. 987 (Fed. Cir. 2018)............................................................................16

*Bull v. Bd. of Trs. of Ball State Univ.*,
    2012 WL 76137 (S.D. Ind. Jan. 10, 2012)....................................................................2

*Chef Am., Inc. v. Lamb-Weston, Inc.*,
    358 F.3d 1371 (Fed. Cir. 2004)....................................................................................19

*GE Lighting Sols., LLC v. AgiLight, Inc.*,
    750 F.3d 1304 (Fed. Cir. 2014)....................................................................................16

*Guardant Health, Inc. v. Vidal*,
    2023 WL 3262962 (Fed. Cir. 2023)..............................................................................16

*Haemonetics Corp. v. Baxter Healthcare Corp.*,
    607 F.3d 776 (Fed. Cir. 2010)......................................................................................18

*Harris Corp. v. IXYS Corp.*,
    114 F.3d 1149 (Fed. Cir. 1997)....................................................................................14

*Hastings v. United States*,
    78 Fed. Cl. 729 (Fed. Cl. 2007) ..............................................................................14, 15

*Horizon Pharma, Inc. v. Dr. Reddy's Laboratories, Inc. et al.*,
    839 Fed. Appx. 500 (Fed. Cir. 2021)............................................................................18

*HTC Corp. v. IPCom GMBH & Co., KG*,
    751 F. Supp. 2d 1 (D.D.C. 2010)...................................................................................8

*Humanscale Corp. v. CompX Intern. Inc.*,
    2010 WL 3222411 (E.D. Va. 2010)..............................................................................11

*ImmunoGen, Inc. v. Vidal*,
    653 F. Supp. 3d 258 (E.D. Va. 2023) .............................................................................7

*Infinity Comput. Prods., Inc. v. Oki Data Ams., Inc.*,
  987 F.3d 1053 (Fed. Cir. 2021)...........................................................................5

*Interdigital Tech. Corp. v. Lenovo Holding*,
  No. 1:19-cv-01590, 2021 WL 1856937 (D. Del. May 10, 2021) ...........................7, 8

*Interval Licensing LLC v. AOL, Inc.*,
  766 F.3d 1364 (Fed. Cir. 2014)...........................................................................6

*IQASR LLC v. Wendt Corp.*,
  825 F. App'x 900 (Fed. Cir. 2020) ....................................................................6, 7

*Jacquelyn Harris and State Compensation Ins. Fund v. United States of America*,
  132 Fed. Appx. 183 (9th Cir. May 25, 2005) .........................................................2

*Mantissa Corp. v. First Financial Corp.*,
  No. 22-1963, 2024 WL 607717 (Fed. Cir. Feb. 14, 2024) ...................................8, 9

*Merck & Co., Inc. v. Teva Pharmaceuticals USA, Inc.*,
  395 F.3d 1364 (Fed. Cir. 2005).........................................................................16

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
  572 U.S. 898 (2014).........................................................................................9

*Novo Indus., LP v. Micro Molds Corp.*,
  350 F.3d 1348 (Fed. Cir. 2003).........................................................................5

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*,
  521 F.3d 1351 (Fed. Cir. 2008).........................................................................11

*In re Paulsen*,
  30 F.3d 1475 (Fed. Cir. 1994)...........................................................................16

*Personalized Media Commc'ns, LLC v. Apple Inc.*,
  952 F.3d 1336 (Fed. Cir. 2020)...........................................................................7

*Phillips v. AWH Corp.*,
  415 F.3d 1303 (Fed. Cir. 2005)...........................................................................4

*Polar Electro Oy v. Suunto Oy*,
  2019 WL 6791353 (D. Utah 2019) .....................................................................16

*Synchronoss Technologies, Inc. v. Dropbox, Inc.*,
  987 F.3d 1358, 1365 (Fed. Cir. 2021)............................................................17, 18

*Thorner v. Sony Comput. Entm't Am., LLC*,
  669 F.3d 1362 (Fed. Cir. 2012).....................................................................12, 16

*Trustees of Columbia University in City of New York v. Symantec Corp.*,
   811 F.3d 1359 (Fed. Cir. 2016)................................................................................................18

## **Rules**

FRCP 26(b)(4)(A) ................................................................................................................2

## <u>TABLE OF EXHIBITS</u>

| Ex. | Description |
|---|---|
| 1 | Expert Responsive Declaration of Dr. Mark P. Mahon |
| 2 | Correspondence between counsel for Samsung and counsel for Datang (May 10, 2024 to May 16, 2024) |
| 3 | '808 patent File History, May 18, 2020 Remarks |
| 4 | U.S. Patent Application Publication No. 2015/0282213 ("Sun") |
| 5 | *Bitmap Index*, Wikipedia, available at https://en.wikipedia.org/w/index.php?title=Bitmap_index&oldid=1188726950 (last accessed May 22, 2024) |
| 6 | U.S. Patent No. 8,811,274 ("Roh") |
| 7 | U.S. Patent No. 7,774,346 ("Hu") |
| 8 | Don H. Johnson, *Electrical Engineering: Noise and Interference*, LibreTexts, available at https://eng.libretexts.org/@go/page/1856 (last accessed May 22, 2024) |
| 9 | *WLAN Network Planning Guide: Basic Knowledge About WLAN Planning*, Huawei Techs. Co., Ltd. (2024) |

## I.    INTRODUCTION

Datang cannot show that a person of ordinary skill in the art ("POSITA") would, with reasonably certainty, understand the scope of the term "dedicated contention resource pool" in the '808 patent.  Instead, Datang argues that the scope of a different term, PRACH, is understood and that a PRACH is an example of "dedicated contention resource pool."  But an example cannot delineate the scope of the broader term "dedicated contention resource pool."  Even if it could, the intrinsic and extrinsic evidence demonstrate a PRACH is not a dedicated contention resource pool.  The Court should find the term "dedicated contention resource pool" indefinite.

Datang's proposed constructions for the disputed terms of the two other patents at issue, the '071 and '923 patent, seek to replace simple and easily understood claim language with a series of lengthy constructions that deviate from the plain meaning.  The Court should decline to rewrite the claims and hold that the plain meaning of the claim language controls, as proposed by Samsung.

The Court should also decline to give the expert declarations Datang submitted with its opening expert reports any weight.  Datang unilaterally refused to make its experts available for deposition and has acknowledged that its expert opinions are of "limited" value.

## II.    THE COURT SHOULD GIVE DATANG'S EXPERT DECLARATIONS NO WEIGHT BECAUSE DATANG REFUSED TO MAKE ITS EXPERTS AVAILABLE FOR DEPOSITION

On May 8, 2024, Datang submitted two expert declarations with its opening claim construction brief ("Datang Op. Br."): [1] the Declaration of Dr. Samir Soliman (Dkt. No. 122-1) and [2] the Declaration of Gwain Bayley (Dkt. No. 122-2).  Samsung promptly reviewed the declarations and, on May 10, 2024, requested that Datang make the experts available for deposition. Ex. 2 at 5–6 (5-10-2024 Email from Hefazi to Bjorklund).  Samsung also agreed to limit any deposition to three hours.  *Id*.  After receiving no response from Datang, Samsung's counsel followed-up on May 14, 2024.  *Id*. at 5 (5-14-2024 Email from Hefazi to Bjorklund).

1

Datang then responded stating that it would not produce its experts for deposition. *Id*. at 4 (5-14-2024 Email from Tamkin to Hefazi). Datang did not assert that the experts were unavailable for a three-hour deposition. *Id*. Instead, Datang took the position that the parties "simply don't have time" for depositions—despite the fact that Samsung had requested the depositions more than twelve days before the deadline for responsive claim construction briefs and twenty days before the claim construction hearing (and had offered dates on which Samsung's expert was available for deposition). *Id*. Datang also argued that the depositions were unnecessary because the "value" of extrinsic evidence, such as its expert declarations, "is limited." *Id*. After the parties' meet-and-confer on May 16, 2024, Datang confirmed that it would not be making its experts available for deposition. *Id*. at 1 (5-16-2024 Email from Tamkin to Hefazi).

The appropriate remedy for the failure to allow an expert's deposition to be taken (as a result of late disclosure or refusal to allow deposition) is exclusion of the expert's testimony. This is not considered an abuse of discretion. *See Jacquelyn Harris and State Compensation Ins. Fund v. United States of America*, 132 Fed. Appx. 183 (9th Cir. May 25, 2005) (affirming exclusion of late disclosed expert opinion in part because it did not permit the witness to be deposed and stating that the "opportunity to review the opposing party's expert witness's report does not satisfy a party's right to depose that expert."); *see also Bull v. Bd. of Trs. of Ball State Univ.*, 2012 WL 76137, at *3 (S.D. Ind. Jan. 10, 2012) ("Fairness compels the immediate availability of Ms. Bull's expert witnesses for deposition. The Court notes that there has been some gamesmanship concerning scheduling of these depositions, and advises that it will strike, for the purposes of summary judgment, the testimony of any expert witness unavailable for deposition within the time allowed to the Defendants."); FRCP 26(b)(4)(A) ("[a] party may depose any person who has been identified as an expert whose opinions may be presented at trial."). Here, it would be unfairly

prejudicial to Samsung to allow Datang to present expert opinions that Samsung cannot probe through deposition. Datang knew (or should have known) that submitting an expert declaration would require it to make its experts available for deposition. Because Datang has refused to make its experts available for deposition, the Court should give the declarations no weight.

## III.    U.S. PATENT NO. 10,785,808

### A.    "dedicated contention resource pool" (claims 1, 2, 3, 4, and 10)[1]

| Samsung's Construction | Datang's Construction |
|---|---|
| Indefinite | Not indefinite. "One or more reserved resource blocks for contention-based random access" |

Samsung asks the Court to determine that "dedicated contention resource pool" is indefinite because Datang identifies no intrinsic or extrinsic evidence that would have reasonably informed a POSITA of the scope of the invention. Datang asserts that "[t]he term 'dedicated contention resource pool for random access' describes a foundational element of the prior art LTE telecommunications system," yet Datang identifies neither intrinsic evidence that defines the term nor extrinsic evidence that uses the term even once. Datang Op. Br. at 19. Instead, Datang merely notes that in the conventional four-step random access process, UEs transmit information to cells over a Physical Random Access Channel ("PRACH") and then summarily concludes that a PRACH is one example of a "dedicated contention resource pool*." Id.* A PRACH does not inform, with reasonable certainty, a POSITA about the scope of "dedicated contention resource pool" for multiple reasons. Ex. 1 ¶ 10.

---

[1]    Dependent claims 5 and 6 depend from independent claim 1, meaning they incorporate this phrase as well and are invalid to the extent that claim 1 is invalid.

1.    <u>Datang Does Not Establish That a PRACH Is a "Dedicated Contention Resource Pool"</u>

To start, Datang fails to establish that a PRACH is, in fact, a "dedicated contention resource pool." Ex. 1 ¶ 11.  ***First***, Datang does not establish that a PRACH is a "resource pool." *Id.*  The intrinsic evidence does not identify a PRACH as a resource pool.  *Id.*  In fact, the '808 patent describes the PRACH as a "resource," not a "resource ***pool***."  *See* '808 patent at 1:27–31.  And Datang identifies no extrinsic evidence labeling a PRACH as a resource pool. Ex. 1 ¶ 11.  Datang's only support is its self-serving expert declaration that states—without citing or analyzing any evidence that would have been available to a POSITA at the time of the invention—that a PRACH "would be understood by a POSITA to be a type of dedicated contention based random access resource pool."  Soliman Decl. ¶ 55.  "[W]hile extrinsic evidence can shed useful light on the relevant art, . . . it is less significant than the intrinsic record in determining the legally operative meaning of claim language."  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1317 (Fed. Cir. 2005) (internal quotations omitted).  Here, Datang provides no meaningful evidence, intrinsic or extrinsic, that a PRACH is a resource pool.

***Second***, Datang does not establish that a PRACH is a "***dedicated contention*** resource pool."  Ex. 1 ¶ 12.  In fact, the '808 patent itself explains that a PRACH can be used for "non-contention based random access."  '808 patent at 1:25–42.  Thus, the intrinsic evidence contradicts Datang's assertion that "the PRACH resources the '808 patent teaches are reserved by the cell for contention-based random access."  Datang Op. Br. at 21.  Datang's support for this assertion is non-existent.  Datang cites to paragraph 49 of its expert declaration in support, but Datang's expert does not testify that the "PRACH resources" that Datang is referring to "are reserved by the cell for contention-based random access."  *See* Soliman Decl. ¶ 49.  Datang also cites to the textbook "An Introduction to LTE" as support, but the textbook states the opposite—explaining that

4

PRACH can be used to initiate both "non-contention-based and contention-based" random access. Ex. G at 163.  Thus, both the intrinsic and extrinsic evidence contradict Datang's statement that a PRACH is a "dedicated contention resource pool."  Ex. 1 ¶ 12.

*Third*, Datang's argument that a PRACH is an example of a "dedicated contention resource pool" further contradicts statements that the patent applicant made when he was applying for the '808 patent. Ex. 1 ¶ 13.  During the application process, the patent examiner identified U.S. Patent Application Publication No. 2015/0282213 ("Sun") as a prior art reference that taught the claims of the '808 patent.  Ex. 3 at 8.  Sun discloses "resource pools" that are defined by a "PRACH Configuration Index," (*see* Ex. 4 ¶¶ 64–73), which according to Datang's own exhibit is a parameter used to "reserve specific resource blocks for the PRACH," (Ex. G at 164; *see also* Ex. 1 ¶ 13).  Despite Sun tying the disclosed resource pool to a PRACH, the applicant argued that "Sun is silent on whether the specific resource pool is a contention resource pool or a non-contention resource pool, much less contemplate that the resource pool is a dedicated contention resource pool." Ex. 3 at 9.  The examiner allowed the '808 patent shortly thereafter.  It is thus improper for Datang to contradict these statements and now assert that PRACH is an example of a "dedicated contention resource pool" when the applicant said the opposite.  *See Novo Indus., LP v. Micro Molds Corp.*, 350 F.3d 1348, 1357–58 (Fed. Cir. 2003) (determining that the disputed term was indefinite and that "the prosecution history undermine[d] Novo's argument" otherwise).  At best, this is an "inconsistent prosecution history statement[]" that confirms the disputed term is indefinite.  *See Infinity Comput. Prods., Inc. v. Oki Data Ams., Inc.*, 987 F.3d 1053, 1059–60 (Fed. Cir. 2021).

In short, the only example of a "dedicated contention resource pool" that Datang even attempts to identify is not a "dedicated contention resource pool" at all.  Datang's inability to provide a valid example of this term confirms that it is indefinite.

2.    A PRACH Does Not Reasonably Inform the Scope of a "Dedicated Contention Resource Pool"

Assuming *arguendo* that a PRACH is an example of a "dedicated contention resource pool," it still does not reasonably inform a POSITA of the scope of the disputed term, which is necessarily broader than a PRACH.  Ex. 1 ¶¶ 14–16.

To start, Datang agrees that a "dedicated contention resource pool" is broader than a PRACH, admitting that "the challenged claim language used by the patentee is more general than the specific 'PRACH' abbreviation used in the prior art."  Datang Op. Br. at 26.  Still, Datang contends that the disputed term is definite because a PRACH is a non-limiting example of a "dedicated contention resource pool."  However, the '808 patent does not identify a PRACH is an example of a "dedicated contention resource pool," and, regardless "such non-limiting examples do not on their own expressly define the bounds—the *limits*—of the claim."  *IQASR LLC v. Wendt Corp.*, 825 F. App'x 900, 906 (Fed. Cir. 2020) (citing *Am. Med. Sys., Inc. v. Biolitec, Inc.*, 618 F.3d 1354, 1361 (Fed. Cir. 2020)).  Here—even if the '808 patent had stated that a PRACH is an example of a "dedicated contention resource pool"—"[w]ith this lone example, a skilled artisan is still left to wonder what other forms of" "dedicated contention resource pools" exist.  *Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1373–74 (Fed. Cir. 2014).

The breadth and indefiniteness of the term "dedicated contention resource pool" is confirmed by the patent itself, which asserts that information about the "dedicated contention resource pool" is broadcast in a "new" manner and format that is "different from that in the existing" standards, but then never explains **how** they are new or different.  '808 patent at 3:56–

60, 6:59–63, 10:52–56, 14:33–37, 19:64–20:2.  Datang tries to preempt this argument by saying that the patent "is explicit that the base station continues to inform UEs of the time and frequency locations of the reserved resource pools" through this "new" information (Datang Op. Br. at 25), but the patent is not so "explicit."  In fact, the patent says only that the base station "***may*** include" time and frequency locations in the information it sends to the UEs, not that the base station ***must*** include this information.  '808 patent At 10:57–61 (emphasis added).  Such open-ended language is "not definitional." *ImmunoGen, Inc. v. Vidal*, 653 F. Supp. 3d 258, 286 (E.D. Va. 2023) (quoting *Personalized Media Commc'ns, LLC v. Apple Inc.*, 952 F.3d 1336, 1343 (Fed. Cir. 2020)); *see also* Ex. 1 ¶ 15.  "A patentee cannot simultaneously use non-modal verbs," like "may," "to avoid limiting the scope of an invention while also arguing that those same examples define the limits of the invention." *IQASR*, 825 F. App'x at 906.  The only limitation that Datang places on "dedicated contention resource pool"—that it must be defined by a time and frequency—is therefore not supported by the intrinsic evidence. Ex. 1 ¶ 15.

Further, although Datang acknowledges that a "dedicated contention resource pool" is broader than a PRACH, Datang fails to explain ***how*** it is broader or identify intrinsic or extrinsic evidence that defines the scope of the broader term. Ex. 1 ¶ 16.  Instead, Datang diverts attention away from this problem by assuring the Court that "conceptual language" like "dedicated contention resource pool" "is often employed and held valid over challenge [*sic*] in mobile telecommunications patents."  Datang Op. Br. at 26.  Datang's support for this statement, however, is lacking.  For example, Datang cites *Interdigital* because the court there construed the term "'dedicated physical resources allocated to' without finding the term indefinite." *Id.* at 26 (citing *Interdigital Tech. Corp. v. Lenovo Holding*, No. 1:19-cv-01590, 2021 WL 1856937, at *8 (D. Del. May 10, 2021)).  But Datang conveniently fails to mention that the parties did not challenge this

term as indefinite and the court accordingly did not analyze this issue. *See Interdigital*, 2021 WL 1856937, at \*8. *Interdigital* is therefore irrelevant here because Samsung is asserting that the disputed term is indefinite.

Datang also cites to *HTC* and asserts that the court there "reject[ed] indefiniteness challenge" to the term "caus[e] the resource of the first base station to remain held in reserve." Datang Op. Br. at 26 (citing *HTC Corp. v. IPCom GMBH & Co., KG*, 751 F. Supp. 2d 1, 33 (D.D.C. 2010)). *HTC* is distinguishable for two reasons. First, the defendant in *HTC* did not argue that the patent failed to inform a POSITA of the scope of the term—the issue in dispute here. *See HTC*, 751 F. Supp. 2d at 33–34. Rather, the defendant argued that the term is "incapable of construction" because it is indistinguishable from another term in the patent, thus rendering it superfluous. *Id.* Unlike here, the parties did not dispute that the intrinsic or extrinsic evidence adequately defined the bounds of "causing the resources of the first base station to remain held in reserve." *See id.* Second, the court construed the disputed term based on intrinsic evidence in the patent-at-issue. *Id.* Here, there is no evidence—intrinsic or extrinsic—that would reasonably inform a POSITA of the scope of "dedicated contention resource pool."

A more on-point case is *Mantissa Corp. v. First Financial Corp.* There, the asserted claims used the term "transaction partner" to describe a party to a financial transaction. *Mantissa Corp. v. First Financial Corp.*, No. 22-1963, 2024 WL 607717, at \*3 (Fed. Cir. Feb. 14, 2024). The plaintiff asserted that a POSITA would have understood the term "transaction partner" to mean a "seller." *Id.* But the claims and specification made clear that the term "transaction partner" was broader than a "seller." *Id.* The Federal Circuit therefore concluded that the plaintiff's "construction may make sense in some contexts," "[b]ut the claims and specification are not so limited, and '[i]t cannot be sufficient that a court can ascribe some meaning to a patent's

claims . . . .'" *Id.* (quoting *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 911 (2014)). Because the intrinsic evidence established only "some meaning" and not the full scope of the disputed term, the Federal Circuit determined that the term was indefinite. *Id.* at *4. The same is true here. Datang admits that a "dedicated contention resource pool" is broader than a PRACH, but then identifies no intrinsic or extrinsic evidence establishing the full scope of the term. Even if the '808 patent had stated that a PRACH is an example of a "dedicated contention resource pool"—it does not—the term would still be indefinite and the challenged claims invalid.

### 3.    Datang Provides No Support for Its Proposed Construction

Datang spends the entirety of its brief attacking Samsung's indefiniteness challenge, and then allocates no pages to identifying intrinsic or extrinsic evidence that support its proposed construction of "dedicated contention resource pool" to mean "one or more reserved resource blocks for contention-based random access." There is thus no evidence in the record that supports this construction. Ex. 1 ¶ 17. The '808 patent never uses the term "resource block," much less defines "resource pool" as "one or more resource blocks." *Id.* And Datang does not identify any extrinsic evidence that defines the term "resource pool" to mean "one or more resource blocks." *Id.* Similarly, the '808 patent does not use the term "reserved," and Datang identifies no extrinsic evidence establishing that "dedicated contention" means "reserved for contention-based random access." *Id.* Samsung respectfully requests the Court reject Datang's construction given the lack of any intrinsic or extrinsic evidence supporting it.

## IV.    U.S. PATENT NO. 9,125,071

### A.    "index" and "bitmap" (claims 2, 10, 13 and 19)

| Term | Samsung's Construction | Datang's Construction |
|---|---|---|
| "index" (claims 2, 10, 13, and 19) | Plain and ordinary meaning | "a pointer into a set of information" |
| "bitmap" (claims 2, 10, 13, and 19) | Plain and ordinary meaning | "a representation of a set of items that allows for identification of item(s) within the set" |

Datang advances lengthy constructions for these single word terms that are not supported by the intrinsic and extrinsic evidence. Datang concedes that "one could quibble with the exact language used" in its constructions (Datang Op. Br. at 18), and Samsung showed in its opening brief that Datang's constructions do not accurately capture the plain meaning. *See* Dkt. No. 123 ("Samsung's Op. Br.") at 16-18. Datang nevertheless argues that its constructions are necessary to establish that an "index" and "bitmap" are "different things" with "different meanings." Datang Op. Br. at 18. Not so.

Initially, Datang's citations to cases stating that "different claim terms are presumed to have different meanings" are irrelevant. Datang Op. Br. at 18. Samsung does not contend that "index" and "bitmap" are synonyms with the same meaning. But that does not mean that the scope of the two terms cannot overlap. Other than conclusory assertions, Datang provides no evidence—intrinsic or extrinsic—to support its argument that scope of the terms "index" and "bitmap" are mutually exclusive. Neither the '071 claim language nor the specification indicate that an "index" can never be a "bitmap" (or vice versa). Rather, the '071 specification describes both an "index" and a "bitmap" as "location information." '071 patent at 10:26-29 ("It shall be noted other information which can determine the locations, *e.g.*, information on a [sic] index, can also be taken as the location information according to the embodiment of the invention in addition to a bitmap.").

Moreover, Datang's assertion that the terms "index" and "bitmap" are mutually exclusive is incorrect. For example, Wikipedia has a dedicated page for the term "bitmap index," which states that it is an "index that uses bitmaps" and was "first introduced . . . in 1985." Ex. 5 at 1-2. Other references similarly confirm that a "bitmap index" is used in various technical fields, including wireless communications, the field of the '071 patent. *See, e.g.*, Ex. 6 [U.S. Patent No. 8,811,274] at 7:14-29 (using "bitmap index" for transmitting channel quality indicator information); Ex. 7 [U.S. Patent No. 7,774,346] (using "bitmap index" in database management systems).

Datang's reliance on *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008), to argue that "it would be improper to not construe the terms" is also misplaced. Here, both parties agree that the terms "index" and "bitmap" are well-understood in the art. Datang Op. Br. at 17 (stating that the terms have "common usage"). Unlike *O2 Micro* there is not a "fundamental dispute" that the Court must resolve in the abstract. *See ActiveVideo Networks, Inc. v. Verizon Communs., Inc.*, 694 F.3d 1312, 1325–26 (Fed. Cir. 2012) ("The district court did not err in concluding that these terms have plain meanings that do not require additional construction."); *Humanscale Corp. v. CompX Intern. Inc.*, 2010 WL 3222411, *2-*4 (E.D. Va. 2010) (rejecting infringer's argument that it was entitled to a new trial because the court did not construe the claim term "tilting" but let the jury apply the plain and ordinary meaning to that term). Thus, the Court need not construe these terms and instead give them their plain and ordinary meaning as proposed by Samsung.

### B.    "interference" (claims 1, 2, 8, 10, 12, 13, 17 and 19)

| Samsung's Construction | Datang's Construction |
|---|---|
| Plain and ordinary meaning | "received power detected on the first group of REs" |

Datang does not point to any lexicography or disclaimer that warrant deviating from the plain meaning of this term. *See Thorner v. Sony Comput. Entm't Am., LLC*, 669 F.3d 1362, 1365-1366 (Fed. Cir. 2012) (claim should be given their plain meaning except "1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee disavows the full scope of a claim term either in the specification or during prosecution."). Thus, the Court should reject Datang's construction, which deviates from the plain meaning in several respects.

First, Datang argues that "interference" should be construed to mean "the combined power from [] various sources," including interference from another cell tower, environmental noise/interference, thermal noise, and other noise. Datang Op. Br. at 14. However, the '071 patent explicitly and consistently distinguishes interference from noise. '071 patent at 1:26-27 ("The quality of channel estimation will be influenced by interference, noise and other factors."); at 1:28-30 ("with different received signal strengths and different noise and interference strengths"); at 1:47-50 ("measuring interference and noise of an adjacent cell"); at 2:52-58 ("Signal to Interference and Noise Ratios (SINRs) of the measurement pilots"). In fact, the subject matter of the '071 patent involves measuring interference from adjacent cells because "[i]nter-cell interference is a major factor restricting the performance of a UE at the edge of a cell." *Id*. at 2:8-12. Noises, such as thermal noise, environmental noises or background noise, are not necessarily from adjacent cells—they may also be from within the cell. Ex. 8 ("Thermal noise plagues all electronic circuits."). Similarly, wireless communication literature also distinguishes

"interference" from "noise." *See, e.g.*, Ex. 9 at 55-56 ("Interference refers to the interference caused by the system or other systems," while "noise signals are related to the environment.").

Second, Datang attempts to tie "interference" to "the first group of REs," *i.e.*, certain time-frequency regions of the radio resources in the cellular system. But interferences can exist on all frequencies and at all time intervals, not just on particular time-frequency regions. Thus, even if certain REs (*i.e.*, time-frequency regions) can be used for measuring interference, that does not mean that interference only exist on those REs and should be tied to only those REs. Therefore, Datang's attempt to narrow the meaning of "interference" contradicts the teachings of the '071 patent itself and the common understanding of the term in the art. Accordingly, the Court should reject Datang's proposed construction and find that "interference" is given its plain and ordinary meaning as Samsung proposes.

### C. "first group of resource elements" / "first group of REs" (claims 1, 2, 8, 10, 12, 13, 17 and 19)

| Samsung's Construction | Datang's Construction |
|---|---|
| Plain and ordinary meaning | "the specifically designated resource elements for interference measurement" |

Datang contends that its construction should be adopted because the first group of resource elements "does not refer to just any set of REs," but rather a group of REs that has been "specifically designated" for interference measurement. Datang Op. Br. at 16. According to Datang, the claim language supports its construction by reciting "a first group of Resource, REs, for interference measurement" and that the user equipment is "to measure interference on the determined first group of REs." *Id.* There is, however, no mention of the phrase "specifically designated" in this or any other claim language, and this phrase in Datang's propose construction does not appear in the specification either. Datang also fails to explain what the phrase

13

"specifically designated" means or why it is necessary. To the extent the phrase means that the first group of resource elements are a group of resource elements for interference measurement, it is superfluous because that requirement is already recited in the claim language. To the extent the phrase is intended to introduce something more, Datang has not provided any justification for adding limitations to the claim language. *See Hastings v. United States*, 78 Fed. Cl. 729, 733 (Fed. Cl. 2007) ("The Federal Circuit has held that where the claim term's meaning is apparent on its face, the court need not venture far from the claim language itself, long admonishing courts not to make constructions that 'contribute nothing but meaningless verbiage to the definition of the claimed invention.'") (quoting *Harris Corp. v. IXYS Corp.*, 114 F.3d 1149, 1152 (Fed. Cir. 1997)).

Moreover, Datang's contention that "Samsung has not identified any alleged error in Datang's construction" (Datang Op. Br. at 17) is also inaccurate. Samsung's opening brief recited several errors in Datang's proposal. *See* Samsung's Op. Br. at 22-23. There is no justification for rewriting the claim language to require that the first group of resource elements be "specifically designated" for interference measurement. The plain meaning should apply.

## V.      U.S. PATENT NO. 11,057,923

### A.      "A*M-bit indication information" (claims 1, 5–6, 9–10 and 14)

| Samsung's Construction | Datang's Construction |
|---|---|
| Plain and ordinary meaning | "bit information that contains data that takes into account both the A and the M variables" |

The claims of the '923 patent recite that a "first indicator field comprises A*M-bit indication information," where "M is a preset or preconfigured quantity of CBGs into which a TB is divided, A is a quantity of TBs comprised in a shared channel transmission, and M and A are integers greater than or equal to 1." Both parties agree that the plain meaning should apply to these terms, including the phrase "A*M-bit indication information" that is at issue here. Consistent with

this, Samsung has proposed that these easily understood terms require no further construction. Their plain meaning is clear: A multiplied by M-bit indication information. Datang fails to explain why Samsung's proposal is wrong or why the Court should rewrite the existing claim language.

Datang instead argues that Samsung has not "identif[ied] any error in Datang's reading." Datang Op. Br. at 28. Not so. Among other things, Datang's proposal injects ambiguity into the claim language by introducing new and unexplained requirements. For instance, Datang's proposal requires that the bit information "contains data that takes into account both the A and the M variable." *Id.* at 29. Datang does not explain how bit information, which are a series of 0s and 1s (*e.g.*, 0110) would contain data "that takes into account both the A and the M variables." Because the language in Datang's proposal is not used in the specification, the parties are also unable to rely upon the specification to make sense of Datang's language. And, as mentioned above, Datang has refused to make its expert available for deposition, leaving Samsung unable to probe Datang's proposal.

Although the meaning of Datang's construction is not entirely clear, it appears to be an attempt to read additional requirements into the first indicator field. The claims of the '923 patent broadly claim a first indicator field and recite that the field comprises a number of bits equal to A multiplied by M. The specification is in accord. For instance, it teaches that in one embodiment there is a single TB (A is equal to one) and four CBGs (M is equal to four), such that the first indicator field comprises four bits of indication information: "0100" (comprises A*M-bit indication information). '923 patent at 15:35-51. There is no disclosure in the specification that the indicator field must "contain" some additional data or that this data must take into account both the A and the M variable. To the extent Datang argues its construction simply requires that the first indicator field comprises A multiplied by M bits of indication information, that requirement

is already sets forth that requirement such that Datang's proposal merely adds excess verbiage and unnecessary ambiguity.  *See Hastings*, 78 Fed. Cl. at 733 (Fed. Cl. 2007).  To the extent Datang's construction requires something more, there is no support for reading in those extra limitations. Accordingly, this term should be given its plain and ordinary meaning as proposed by Samsung.

**B.    "supports" / "does not support" (claims 2, 7, 11 and 15)**

| Samsung's Construction | Datang's Construction |
|---|---|
| Plain and ordinary meaning | "will use" / "will not use" |

The terms "supports" and "does not support" are commonly understood words.  Datang has not pointed to any dictionary or other evidence that remotely suggests these terms' plain meaning is "will use" and "will not use," respectively.

Datang also cannot meet the high bar for showing lexicography.  The Federal Circuit has long-held that "[w]here an inventor chooses to be his own lexicographer and to give terms uncommon meanings, he must set out his uncommon definition in some manner within the patent disclosure so as to give one of ordinary skill in the art notice of the change." *In re Paulsen*, 30 F.3d 1475, 1480 (Fed. Cir. 1994); *see also Merck & Co., Inc. v. Teva Pharmaceuticals USA, Inc.*, 395 F.3d 1364, 1370, 73 U.S.P.Q.2d 1641, 1646 (Fed. Cir. 2005) (same).  The Federal Circuit has explained that the "bar for lexicography is exacting." *Guardant Health, Inc. v. Vidal*, 2023 WL 3262962, *2 (Fed. Cir. 2023) (citing *Thorner v. Sony Comput. Ent. Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012); *Barkan Wireless Access Technologies, L.P. v. Cellco Partnership*, 748 Fed.Appx. 987, 990 (Fed. Cir. 2018) ("Our cases, however, set a high standard for lexicography.").  "To act as its own lexicographer, a patentee must clearly set forth a definition of the disputed claim term, and clearly express an intent to define the term."  *GE Lighting Sols., LLC v. AgiLight, Inc.*, 750 F.3d 1304, 1309 (Fed. Cir. 2014).  "Examples of clear lexicography include saying 'this term means …' or 'the term is defined as….'"  *Polar Electro Oy v. Suunto Oy*, 2019 WL 6791353, *5

(D. Utah 2019) (statement "[i]n the above-described embodiments, the expression substantially linear refers to ...." was not sufficient for lexicography).

Here, Datang has pointed to no definitional language for the term "supports" or "does not support" in the specification. Rather, Datang cites to a couple disclosures in the specification and argues that a POSITA would interpret them to use the term "support" to mean "will use." Datang Op. Br. at 27 (citing '923 patent at 11:54-67). But Datang ignores other uses of the term "support" in the specification that indisputably uses the term "supports" to mean "capable of," consistent with its plain meaning. *See, e.g.,* '923 patent at 1:23-25 ("Based on different configured transmission modes, a PDSCH/PUSCH may support transmission of one or two TBs."), 2:1-3 ("In conclusion, no related method that supports CBG-based retransmission and ACK/NACK feedback is available in the related art."), 1:62-64 ("A 5G system supports more diversified and complex data transmission."), 9:25-35 ("when CBG-based retransmission and ACK/NACK is supported in the 5G-NR system"). Thus, the specification does not set forth a clear intent to redefine "supports" or "does not support." Datang has fallen fall short of meeting the "exacting" standard needed for lexicography.

Unable to show lexicography, Datang argues that the Court should rewrite the claim language because application of the plain meaning would render the claims "nonsensical." Datang Op. Br. at 27 ("It would be nonsensical to interpret the word 'supports' here to mean 'capable of': the base station cannot tell a specific terminal device whether the terminal device 'is capable of' CBG-based transmission."). Accepting Datang's argument means that the claims are indefinite ("nonsensical"). It does not mean that the Court should rewrite the claims, as Datang is requesting. Indeed, Datang's argument invites the Court to commit legal error because the Federal Circuit has repeatedly held that courts should _not_ rewrite claims that are indefinite to preserve their validity.

For example, *Synchronoss Technologies, Inc. v. Dropbox, Inc.*, involved a claim that recited "generating a [single] digital media file" that "compris[es] a directory of digital medial files." 987 F.3d 1358, 1365 (Fed. Cir. 2021). Like Datang, the patentee in *Synchronous* argued that the term "comprising" cannot be given its customary meaning (*i.e.*, "containing" or "including") because it would render the claim nonsensical. *Id.* ("comprising was admittedly the wrong choice of words" because "a digital media file cannot contain a directory of digital media files") (internal quotations omitted). Thus, the patentee urged the Court to construe "comprising" to mean "resulting in." *Id.* The district court declined to do so and found the claim indefinite. *Id.* The Federal Circuit then affirmed, explaining that "[a]dopting Synchronoss's proposal would require rewriting the claims, but 'it is not our function to rewrite claims to preserve their validity.' We therefore hold that the claims are indefinite as a matter of law under § 112, paragraph 2." *Id.* at 1366-1367 (internal citations omitted). Numerous other courts have similarly declined to redraft nonsensical claim language to avoid indefiniteness. *See, e.g., Haemonetics Corp. v. Baxter Healthcare Corp.*, 607 F.3d 776, 782 (Fed. Cir. 2010) ("Haemonetics argues, and the district court concluded, that because the vessel with the tubing is larger than the vessel alone, construing 'centrifugal unit' in the context of the dimensional limitations to include the tubing 'would yield an absurdity.' Maybe so, but we do not redraft claims to contradict their plain language in order to avoid a nonsensical result.") (internal citations omitted); *Horizon Pharma, Inc. v. Dr. Reddy's Laboratories, Inc. et al.*, 839 Fed. Appx. 500, 504-505 (Fed. Cir. 2021) (holding claims were indefinite and explaining that the claim term "target" is "a commonly understood word" that "does not warrant judicial redrafting" to preserve the validity of the claims and avoid a "nonsensical" result); *Trustees of Columbia University in City of New York v. Symantec Corp.*, 811 F.3d 1359, 1366–67, (Fed. Cir. 2016) ("The claims are nonsensical in the way a claim to extracting orange

juice from apples would be, and are thus indefinite….What HydReclaim fails to realize is that such a nonsensical result does not require the court to redraft the claims of the '943 patent."); *see also Chef Am., Inc. v. Lamb-Weston, Inc.*, 358 F.3d 1371, 1374 (Fed. Cir. 2004) ("Even a nonsensical result does not require the court to redraft the claims of the [patent]."). Accordingly, we affirm the district court's holding that the claims of the '698 patent and the '208 patent are invalid for indefiniteness."). Thus, the Court should reject Datang's attempt to redraft the claims. The terms at issue should be given their plain meaning, even if that results in the claims being indefinite.

## VI.    CONCLUSION

For the foregoing reasons and those in Samsung's Opening Brief, Samsung respectfully requests that the Court find that the term "dedicated contention resource pool" is indefinite rendering the challenged claims of the '808 patent invalid, and that it find that the remaining terms are given their plain and ordinary meaning.


Dated: May 22, 2024                     By:  _____/s/_____

Christopher J. Burrell (admitted *pro hac vice*)
Brianna Lynn Silverstein (VA Bar #78491)
James R. Carpenter (admitted *pro hac vice*)
Katlyn M. Moseley (VA Bar #92420)
Ahmad Malik (admitted *pro hac vice*)
**FAEGRE DRINKER BIDDLE & REATH LLP**
1500 K Street, NW
Suite 1100
Washington, DC 20005
Tel: (202) 230-5000
Fax: (202) 842-8465
Chris.Burrell@faegredrinker.com
Brianna.Silverstein@faegredrinker.com
James.Carpenter@feagredrinker.com
Katlyn.Moseley@faegredrinker.com
Ahmad.Malik@faegredrinker.com

David J.F. Gross (admitted *pro hac vice*)
Timothy Grimsrud (admitted *pro hac vice*)

**FAEGRE DRINKER BIDDLE & REATH LLP**
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402
Tel: (612) 766-7000
Fax: (612) 766-1600
David.Gross@faegredrinker.com
Tim.Grimsrud@faegredrinker.com

Todd M. Briggs (admitted *pro hac vice*)
**QUINN EMANUEL URQUHART &**
**SULLIVAN LLP**
555 Twin Dolphin Dr., 5th Floor
Redwood Shores, CA 94065
Tel: (650) 801 5000
Fax: (650) 801 5100
ToddBriggs@quinnemanuel.com

Nima Hefazi (admitted *pro hac vice*)
Zhaoxin (John) Yin (admitted *pro hac vice*)
**QUINN EMANUEL URQUHART &**
**SULLIVAN LLP**
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017
Tel: (213) 443-3000
Fax: (213) 443-3100
NimaHefazi@quinnemanuel.com
JohnYin@quinnemanuel.com

Christopher Robert Sabbagh (admitted *pro hac vice*)
**QUINN EMANUEL URQUHART &**
**SULLIVAN LLP**
711 Louisiana Street, Ste. 500
Houston, TX 77002
Tel: (713) 221-7000
Fax: (713) 221-7100
ChrisSabbagh@quinnemanuel.com

Jun Zheng (admitted *pro hac vice*)
**QUINN EMANUEL URQUHART &**
**SULLIVAN LLP**
300 West 6th Street, Suite 2010
Austin, TX 78701
Tel: (737) 667-6100
Fax: (737) 667-6110
JunZheng@quinnemanuel.com

*Counsel for Plaintiffs Samsung Electronics Co., Ltd. and Samsung Electronics America, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 22, 2024, I filed a copy of the foregoing with the Clerk of

Court using the CM/ECF System, which sent notification of the filing to all counsel of record.

<u>         /s/         </u>
Brianna Lynn Silverstein
